[Crim. No. 2253.   Third Dist.   May 18, 1951.]

THE  PEOPLE,  Respondent,  v.  CHARLES  EDWARD
WILLIAMS, Appellant.

Edises & Truehaft and John Chas. Henderson for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier,
Deputy Attorney General, for Respondent.

ADAMS, P. J.—A jury convicted defendant of robbery
in the first degree.  This appeal is taken from the judgment
which followed, and from a subsequent order denying his
motion for a new trial.  Mrs. Marlatt, the victim of the
robbery, testified that about 10:35 p. m. on January 11, 1950,
when she was alone in her house in Vallejo, she went to her
door to let her dog in; that a man grabbed her and pushed her
back into the house; that defendant followed them and both
men demanded money, and slapped and kicked her until she
surrendered her purse containing $45, which money they took
and departed; and that she subsequently identified defendant
at the police station.  Defendant denied her accusations and

relied upon an alibi, testifying that he was at his mother's home; that his wife, his mother, his sister, Louise Toles, and two friends, Robert Williams and L. C. Martin, were also there. The mother testified in support of this alibi, as did Lloyd C. Martin and Robert Williams.

■ On rebuttal the prosecution first called Louise Toles on behalf of the prosecution. She testified that on January 11, 1950, she and her husband, her brother (the defendant) and his wife were living with her mother. She was then asked if she recalled a visit to her by Captain Horan, a police officer, on January 23, 1950, in the absence of defendant. She replied that she did, and was asked what was said during that conversation. Objection was made by counsel for defendant on the ground that any conversation held outside the presence of defendant was inadmissible. The objection was sustained. The deputy district attorney then said: "Counsel is absolutely correct. I merely put this in the record for the purpose of what will follow." Louise then testified that her brother was at home the night of the robbery. The following then occurred:

"[MR. KRAUSE] Q. Is it not a fact that you told Dan Horan on that occasion——

"MR. HENDERSON: (Interrupting) Just a moment. . . . To which I will object. It is attempting to impeach his own witness.

"MR. KRAUSE: That is right.

"MR. HENDERSON: He has not shown any surprise. Counsel knows the rules of evidence.

. . . . . . . . . . . .

"THE COURT: The objection is good as set. You had better remodel your question.

"BY MR. KRAUSE: Q. Have you at any time ever stated to anyone anything different than you have just testified to regarding the whereabouts of this defendant, Charles Edward Williams, on the 11th day of January, 1950?

"MR. HENDERSON: . . . The same objection. It is cross examination of his own witness.

"THE COURT: Same ruling. The objection is good.

. . . . . . . . . . . .

"BY MR. KRAUSE: Q. You talked to Captain Dan Horan at that time, did you not?

"A. I did.

"Q. Did you say anything to him other than you have testified to now on the witness stand regarding the where-

abouts of this defendant on the 11th day of January, 1950?

"Mr. Henderson: . . . Any statement that she made, if it was outside the presence of the defendant, the law clothes the defendant with that protection to keep prejudicial evidence from coming in. She cannot testify to anything she said to anybody unless the defendant was present. . . .

"Mr. Krause: If the Court please, before I can impeach her by the other party to this conversation, I have to ask her whether she did not make the statements. That is perfectly permissible, and I intend to do that; if she says that she did not make the statements, I intend to put Captain Dan Horan on the stand to testify she made statements different than she is making now. I have a right to be surprised, because I have a right to rely on the police department's investigation, and the investigation of Captain Dan Horan as to the facts he found out and supplied the District Attorney prior to the prosecution of this case. I have a right to rely upon what the persons he has interviewed have told him, and if she changes her story now, I have a right to bring that out. I can show surprise, and I am showing surprise that she would tell Captain Horan one story and now change her testimony to something else at another time, and the law certainly permits that."

Objection to the question was sustained by the court. The jury was then excused, and in their absence counsel for the prosecution argued that he had a right to impeach his own witness when taken by surprise. The court said:

"Did you really believe that when you put her on?

"Mr. Krause: Yes. That is one of the main reasons we have gone forward with this prosecution, the police investigation. My offer of proof is that this witness——

"The Court: (Interrupting) I don't believe that you thought in your own heart that she would testify he was away that night. I don't believe when you put her on you felt that. I want to be right in these cases, and I want to act in good faith with everybody concerned.

. . . . . . . . . . .

"The Court: (Interrupting) Did you ever ask her any questions before you put her on the witness stand?

"Mr. Krause: Captain Horan did.

"The Court: Did you?

"Mr. Krause: I didn't.

"The Court: You are the one to be taken by surprise,

because you are the trial lawyer in the matter. Did you ever ask her any questions? .

"Mr. KRAUSE: I relied upon the Police Department's investigation."

The jury having been returned, Mrs. Williams, wife of defendant, was called as a witness for the prosecution and was asked if she, also, had had a talk with Captain Horan, to which she answered that she had. Then followed:

"Mr. KRAUSE: I see. Of course, I can't ask her what that was. That was objected to as hearsay. I am anticipating something of the sort. I will ask what was said and let counsel object.

"Mr. HENDERSON: To which I will object on the grounds it would be hearsay, not being made in the presence of this defendant.

"Mr. KRAUSE: The objection is good, your Honor.

"THE COURT: The objection is sustained."

Captain Horan was then called by the prosecution and testified that he had interviewed Louise Toles. Objection to what was there said was sustained, and the prosecuting attorney said: "The objection is good, your Honor." Captain Horan then testified that he had called upon defendant's sister, Lulu Mae Brown, and asked her the same questions asked Louise Toles. The deputy district attorney said:

"Q. And what was the reply to that?

"A. They——

"Mr. HENDERSON: . . . To which I will object on the grounds it is irrelevant and immaterial and hearsay.

"THE COURT: The objection is sustained.

"Mr. KRAUSE: Yes, counsel's objection is good, your Honor."

Captain Horan next testified that after talking to Louise Toles and others he returned to the police station where he told defendant that he had "seen his sister Louise and had asked her if he was home that night of January 11, 1950, and she told me that Williams had gone to his sister's house on that night and had returned around midnight, and that he slept there that night and had been there the next morning"; and that defendant made no reply. Regarding this line of testimony the court ruled that it was admissible only for the purpose of showing defendant's reactions, and not as evidence of the truth of the statements made to the officer; and the prosecution attorney said, "There is no question about it."

But in the course of the argument to the jury the deputy district attorney commented on the fact that the wife and sisters of defendant were present at the trial but did not testify. He said:

"Where are they? Where are the three sisters and the wife of the defendant, and where is the brother-in-law of the defendant? The other sister's husband? Why aren't they brought here and put under oath to testify? There is something very peculiar there, and I have my ideas of what it is. Unfortunately, under the rules of evidence, we can't bring out everything in these criminal cases that we would like to bring out, but fortunately the jury in a criminal case can form inferences and can read between the lines, so to speak, by the facts that are shown to them before the jury themselves. I had to call the wife of the defendant. I asked her if Captain Dan Horan talked to her the day after her husband was arrested, and she said yes, he had been there. I asked what was said. Counsel objected. *I asked purposely, just to get that into the record:* I wanted to get that conversation in, and counsel objected, and of course his objection was good. It is hearsay, outside the presence of the defendant, and I could not get it in. I followed the same procedure with Louise, the other sister of the defendant, and got the same results." (Italics added.)

Appellant charges that the action of the prosecuting attorney as above outlined constituted misconduct, justifying reversal. In view of the decision of our Supreme Court in the recent case of *People* v. *Newson,* 37 Cal.2d 34 [230 P.2d 618], we agree with that contention. There the Supreme Court reversed the conviction of the defendant because the district attorney was permitted to impeach his own witness by use of prior inconsistent statements made to a deputy district attorney and testimony previously given by the witness at the preliminary examination. The court said, at page 41:

"The right of a party to impeach his own witness is the subject of extensive legal writing and has been considered in numerous decisions. Such impeachment generally was forbidden under the Roman law, as appears inferentially from the Code Justinian. English common law followed the same rule. (3 Wigmore, Evidence [3d ed. 1940], § 896 et seq.; *Crago* v. *State,* 28 Wyo. 215 [202 P. 1099].) The first case in this country upon the subject is *State* v. *Norris,* 2 N.C. 429

[1 Am.Dec. 564], in which the court held that the state may produce contradictory statements of its witness. However, in 1806, the doctrine was repudiated. (*Sawrey* v. *Murrell*, 3 N.C. 397.) Since those early years, exceptions have been engrafted upon the rule to prevent injustice when a party who calls a witness is surprised or entrapped by one who gives adverse testimony.

"In 1872, the California Legislature enacted section 2049 of the Code of Civil Procedure, which provides: 'The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony. . . .' However, the prior statements inconsistent with the witness' present testimony can only be considered for the purpose of neutralizing and counteracting the effect of his statements upon the trial.

"The purpose of the statute is to allow a party to wipe out, as nearly as possible, the evidence which has been given. Where a witness states no fact against the party calling him, there is nothing to counteract. The testimony which may be contradicted must be prejudicial and detrimental, otherwise the previous statement shown would stand out, not as offsetting contrary testimony already given, but as substantive evidence of a fact."

Pertinent cases there cited are *People* v. *Jacobs*, 49 Cal. 384, *People* v. *Mitchell*, 94 Cal. 550 [29 P. 1106], *In re Kennedy*, 104 Cal. 429, 431-432 [38 P. 93], *People* v. *Godwin*, 123 Cal. 374 [55 P. 1059], *People* v. *Crespi*, 115 Cal. 50 [46 P. 863], *People* v. *Creeks*, 141 Cal. 529 [75 P. 101], and *People* v. *De Witt*, 68 Cal. 584 [10 P. 212]. In the Jacobs case the court said, page 385: ". . . though the witness had failed to testify to all the prosecution expected or desired, he had not, as a witness for the prosecution, testified against the prosecution or to any matter advantageous to the prisoner." In the Mitchell case, at page 556, the court said: "A witness, whichever party calls him, cannot be impeached unless he has given testimony against the impeaching party. This witness had not testified against the prosecution. He simply failed to testify to a fact which the district attorney thought he could prove by him. . . . The impeaching statements were evidently desired as evidence. If such testimony were admissible, it would be easy to manufacture evidence of that kind. If a witness merely fails to testify as expected, that does not au-

thorize the party calling him to prove that the witness had elsewhere made the desired statements. It is only when he has given damaging testimony that he can be impeached." In the Crespi case, page 55, we find the statement that the attempt to impeach was not permissible; that "It was an attempt by a party to impeach his own witness, not because that witness had given hostile evidence which had taken him by surprise, but because he did not admit what was sought to be elicited from him." In the Godwin case the court said, at page 375: "It is only when the witness gives hostile evidence that a party may impeach him by showing contradictory statements made at other times. The answer of the witness being 'no,' the evidence was purely of a negative character. It was neither favorable to one side nor the other, and, if the witness had been impeached, the case before the jury would have assumed no different aspect."

Language used by the Supreme Court in the Creeks case is particularly pertinent here. It said, at pages 531-532: "The testimony was sought to be elicited solely for the purpose of getting before the jury statements made by the mother on a prior occasion, tending to make out the case of the people. Where a witness called by a party has simply failed to testify to all that party expected or desired, but has not given testimony *against* him, it is not permissible for the party calling him to prove that such witness had previously made statements which, if sworn to at the trial, would tend to make out his case."

In *People* v. *Berg,* 96 Cal.App. 430, 440 [274 P. 433], the court quoted as follows from the Creeks case: "If a witness merely fails to testify as expected, that does not authorize the party calling him to prove that the witness had elsewhere made the desired statements." See, also, *People* v. *Flores,* 37 Cal.App.2d 282, 287 [99 P.2d 326], in which it was said: "There was no showing that the district attorney had ever talked with the witness Almerez or that the latter at any time led the prosecutor to believe that he would testify as counsel for the People declared he expected the witness would. It requires no citation of authority for the statement that the party producing a witness cannot claim surprise and thereby *ipso facto* acquire a right to cross-examine such witness simply because the latter does not testify as expected. The examination of the witness proceeded apparently upon the theory that the district attorney could pursue the inquiry as a matter of right. Such is not the law."

In the case before us the claimed previous statements of the witnesses which the prosecutor sought to get to the jury were admitted by him to be hearsay and not admissible against the defendant. Despite such admission of the prosecutor he persisted, over objections sustained, in pursuing the same course with another witness, and then argued the objectionable matter to the jury as hereinbefore stated.

In *People* v. *Anthony*, 185 Cal. 152, 159 [196 P. 47], the court said: "Ordinarily, the prompt sustaining of objections to improper questions, coupled with instructions to the jury to disregard the question, will cure an error of this kind. But where the offense has been repeated in various forms and where the evidence is so evenly balanced and the district attorney after being warned by the court continues in his course, we must hold that the misconduct was so prejudicial as to entitle the defendant to a new trial."

In *People* v. *Ephraim*, 77 Cal.App. 29, 42 [245 P. 769], hearing in Supreme Court denied, the court held that where the misconduct on the part of the state occurs throughout the examination of witnesses and in the arguments to the jury with such frequency that the jury is led to believe that the district attorney, as the sworn officer of the court, has in his possession facts so damaging to the defendant on trial that the defendant must insist on their being withheld, the judgment should be reversed.

The record before us reveals a sharp conflict of evidence and an examination of the entire transcript does not convince us that the same verdict would have been reached without the weight of the objectionable incidents above set forth. In *People* v. *Pang Sui Lin*, 15 Cal.App. 260, 262 [114 P. 582], this court said that a district attorney "is the representative of the people in a very important capacity, is generally of consequence in the community, and it is a reasonable and almost necessary inference that some at least of the jurors would conclude that the district attorney would not ask such questions unless he could prove what was implied in such questions if he had been allowed to do so."

Also see *People* v. *Terramorse*, 30 Cal.App. 267, 272 [157 P. 1134]; and *People* v. *Wells*, 100 Cal. 459, 464 [34 P. 1078], quoting from *People* v. *Mullings*, 83 Cal. 138 [23 P. 229, 17 Am.St.Rep. 223], to the effect that "It is quite evident that the *questions,* and not the answers, were what the prosecution thought important. The purpose of the questions clearly was to keep persistently before the jury the assumption of damag-

ing facts which could not be proven, and thus impress upon their minds the probability of the existence of the assumed facts upon which the questions were based. To say that such a course would not be prejudicial to defendant is to ignore human experience and the dictates of common sense.''

Other grounds for reversal are urged by appellant, but in view of our conclusion that for the foregoing reasons the judgment must be reversed, they need not be considered here.

The judgment and the order denying a new trial are, and each of them is, reversed, and the cause is remanded for a new trial.

Peek, J., and Deirup, J. pro tem., concurred.