[Crim No. 7136. In Bank. July 9, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. RAYMOND MARTY HAMILTON, Defendant and Appellant.

Martin N. Pulich, Public Defender, John D. Nunes, Chief Assistant Public Defender, and Chris G. Gasparich, Assistant Public Defender, for Defendant and Appellant.

Stanley Mosk, Attorney General, John S. McInerny and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

PETERS, J.—By jury verdicts defendant was found guilty of the first degree murders of Estella Hamilton (count one) and of Lorenzo Bernard (count two). The jury fixed the penalty on count one at life imprisonment, and on count two at death. Motions for a new trial and reduction of the penalty on the second count were denied. The appeal is automatic (Pen. Code, § 1239, subd. (b)).

This is the second trial and appeal in this case. The first trial resulted in death penalty judgments on both counts, which were reversed. (*People* v. *Hamilton* (1961) 55 Cal.2d 881 [13 Cal.Rptr. 649, 362 P.2d 473].)

Defendant does not challenge the sufficiency of the evidence to sustain the murder convictions, but he does contend that a variety of errors occurring at both the guilt and penalty trials were so serious and prejudicial as to require a reversal. Although several serious errors did occur on the trial of the guilt issue, we are of the opinion, after a reading, review and consideration of the entire record, that the evidence of guilt is so convincing and overwhelming that such errors, considered singly and together, did not militate against defendant receiving a fair and impartial trial. Therefore, on the guilt issue, as to both convictions, the judgments must be affirmed. But very serious errors also occurred on the penalty phase of the trial on count two. Here the overwhelming nature of the evidence as to guilt does not have the same impact as it has on the guilt issue. After a reading, review and consideration of the entire record we must hold that such errors were prejudicial, and must therefore reverse this phase of the judgment.

Defendant was charged with the murder of Estella Hamilton, his ex-wife, and Lorenzo Bernard, who at the time of the killings, were together in Estella's bedroom under somewhat compromising circumstances. Estella was shot by defendant, but the cause of her death was a combination of

the gunshot wound and the laceration of her neck when she either fell or was pulled through the glass pane of the bedroom window. Bernard died of gunshot wounds inflicted by defendant. It was the prosecution's theory that defendant, while armed and with felonious intent, broke into Estella's home on the night in question, and that the resultant killings were felony murders. Defendant admitted the shootings, but contended that he killed Bernard in self-defense, and that Estella's death was accidental. In support of such defense defendant claimed that he had gone to Estella's home at her request but en route he was detained, and Bernard arrived there in the interim; that because of Bernard's presence Estella did not wish defendant to enter; that defendant in a fit of anger then kicked in the bedroom window and stepped inside; that Bernard attacked him with a knife and defendant shot Bernard in self-defense; that in the scuffle Estella was accidentally shot and fell into the broken window, and she was further cut when he tried to pull her out the window. Defendant admitted being in possession of the fatal gun. He claimed to have taken it from his brother's home in Los Angeles, during a visit there some two weeks before the killings, for the purpose of fixing a spring adjustment. However, whether or not this was so, defendant admits that he took the gun the night of the killings from his own apartment in Oakland as he prepared to go to Estella's home in Berkeley.

Without recounting the evidence further in detail, the evidence demonstrates not only that the two killings were committed during the perpetration of a felony, but also supports the conclusion that they were premeditated crimes. It should also be said that the record shows that defendant has a long record of prior convictions, both of felonies and misdemeanors, and also of parole violations. ▮ But, as has frequently been said, even a thoroughly bad man is entitled to a fair trial. It is necessary to consider whether defendant had such a trial on both the issues of guilt and penalty.

*The guilt phase of the trial.*

▮ Appellant claims that it was error to allow the prosecution to introduce into evidence an offer of compromise which he made, and the district attorney rejected, prior to the trial. Lloyd Jester, a member of the district attorney's staff, was allowed to testify that on a date between appellant's arrest and the first trial he met with appellant in the county jail, and that at such time appellant offered to plead guilty if arrangements could be made to assure him a life

sentence. A motion to strike this testimony was denied.

It was error to admit this offer to plead guilty into evidence.

It is true that, in the absence of statute, it has been held in California that an offer to plead guilty is admissible *(People v. Boyd,* 67 Cal.App. 292, 302-303 [277 P. 783]; *People v. Cooper,* 81 Cal.App.2d 110, 117-118 [183 P.2d 67]). It has also been held that a plea of guilty, later withdrawn is admissible *(People v. Ivy,* 163 Cal.App.2d 436 [329 P.2d 505]). In the absence of statute, the underlying theory of these cases is that by his plea or offer to plead guilty the defendant has made, in fact, an admission of guilt. In jurisdictions other than California the cases are in conflict. (See discussion 4 Wigmore, Evidence (3d ed. 1940) § 1067, p. 66.)

But all of the cases cited above were either decided before Penal Code sections 1192.1 through 1192.4 were enacted in 1955 and 1957, or failed to mention those sections. By these enactments the Legislature has changed the law in California on this subject.

Section 1192.1 provides that if a defendant is charged with a crime divided into degrees, upon a plea of guilty, when consented to by the prosecutor and approved by the court, the plea may specify the degree, and defendant cannot be thereafter punished for a higher degree. Section 1192.2 makes the same rule applicable to pleas of guilty before a committing magistrate. Section 1192.3 provides that in cases where the jury can select various punishments, the plea of guilty may specify the punishment to be imposed, and, if accepted by the prosecution and approved by the court, no more severe punishment than specified in the plea may be imposed. Section 1192.4 (added to the Penal Code in 1957, Stats. 1957, ch. 1297, p. 2616, § 4) was passed for the obvious purpose of supplementing the other three sections. It provides: "If the defendant's plea of guilty pursuant to section 1192.1, 1192.2 or 1192.3 of this code be not accepted by the prosecuting attorney and approved by the court, the plea shall be deemed withdrawn and the defendant may then enter such plea or pleas as would otherwise have been available. The plea so withdrawn may not be received in evidence in any criminal, civil or special action or proceeding of any nature, including proceedings before agencies, commissions, boards and tribunals."

By this section, the Legislature has decided, just as it did many years ago in civil cases by prohibiting the introduc-

tion into evidence of offers to compromise (Code Civ. Proc., § 2078), that it is in the public interest that pleas of guilty to a lesser degree of crime shall not be admissible. ▮ The obvious purpose of the section is to promote the public interest by encouraging the settlement of criminal cases without the necessity of a trial. (See McCormick, Evidence (1954) § 251, p. 543.) ▮ Certainly, it cannot reasonably be argued that while a plea of guilty to a lesser degree is not admissible, that an offer to plead guilty to such lesser degree is admissible. There is no material difference between actual pleas of guilty to a lesser degree of the crime charged, and offers to plead guilty to a lesser degree.

We therefore conclude that appellant's offer to plead guilty if assured of a life sentence, as made to a representative of the district attorney was improperly admitted into evidence. By virtue of the provisions of section 1192.4 the earlier cases treating such offers to plead and pleas as admissions of guilt are no longer controlling. But for reasons hereafter stated, we do not think that this error resulted in a "miscarriage of justice," on the guilt phase of the trial, as those words are used in article VI, section 4½, of the Constitution.

▮ Appellant next contends that the prosecution was guilty of misconduct, and that the trial court erred in failing to rectify the situation when the prosecutor made an improper attempt to impeach his own witness. One of the least important issues involved at the trial was the question of when appellant *first* obtained the gun with which he was armed at the time of the killings. According to the prosecution, appellant took the gun, without permission, from the home of his brother in Los Angeles on the evening of the homicides before boarding an airplane for San Francisco. The defense contended that appellant took the gun from his brother's home on a visit to Los Angeles some two weeks earlier, for the purpose of repairing it; that appellant left the gun at his own apartment in Oakland, and then picked it up that night on the way to Estella's home in Berkeley.[1]

In an attempt to prove premeditation, the prosecution called Nolan Hamilton (appellant's brother) for the ostensible purpose of having him testify that appellant took the gun from his Los Angeles home on the very afternoon of the homicides. When the witness testified that he was unable

---

[1] Thus the parties differ only as to the date when appellant first obtained the gun; under either theory, appellant picked up the gun after he determined to proceed to Estella's home and in the belief that both victims were together there.

to state when the gun was taken, the prosecutor claimed surprise and produced a written statement purportedly signed by the witness and which stated that appellant had taken the gun on the day of the killings. The defense objected, and during the ensuing argument it developed that the witness had testified for the prosecution at the first trial, that his testimony then was the same as at the present trial, and that the written statement had been obtained prior to the first trial. The court sustained the objection insofar as claimed surprise was concerned, and refused to allow the prosecution to impeach the witness by means of the statement, but it also refused the request of the defense that the jury be admonished to disregard the remarks of the prosecutor concerning the purpose of the signed statement. The prosecution was then allowed to show the statement to the witness for the alleged purpose of refreshing his recollection. This proved unavailing and the prosecutor thereupon asked several specific questions which, while failing to obtain any change in the witness' testimony, had the effect of advising the jury of everything that was in the written statement (including hearsay of what a police officer had told the witness regarding the date on which the gun was taken). The court's rulings on the defense objections during such examination were vacillating, at times allowing the improper questioning and at times ordering the prosecution to drop the matter and proceed to something else. But even after the latter rulings, the prosecution persisted with the same type of examination as above indicated.

It cannot reasonably be presumed that the prosecutor, as an experienced trial lawyer, was unaware that he could not claim surprise under the circumstances. The testimony was not "unexpected" (*People* v. *Flores* (1940) 37 Cal.App. 2d 282, 286-287 [99 P.2d 326]) nor was it damaging and prejudicial to the prosecution's case. (*People* v. *Newson* (1951) 37 Cal.2d 34, 41-44 [230 P.2d 618].) There was no claim or attempt to show that the prosecutor had talked with the witness about the written statement during the period between the two trials. ▉ It is error to permit counsel, under the guise of refreshing the witness' memory, to get before the jury a former statement when the object is to discredit the verity of the testimony presently given. (*People* v. *Zammora* (1944) 66 Cal.App.2d 166, 217 [152 P.2d 180].) ▉ Here the prosecuting attorney was fully aware of how

this witness would testify long before he called him. He had in his possession a document, signed by the witness, which contained statements contrary to the import of that testimony. He made no attempt to discuss that situation with the witness before calling him to the stand. Instead he chose the improper method above outlined. Moreover, when told by the court that he could not read the statement into the record, he proceeded to introduce it by indirect means. Such procedure was obvious misconduct. Additionally, the court erred both in failing to admonish the jury as requested and in failing to prevent the prosecuting attorney from continuing in his course of improper examination. However, as above indicated, the question of when the gun was first taken from the brother's home was of little significance. For that reason, and for other reasons later set forth, neither the misconduct nor the error was prejudicial.

Appellant next contends that during the trial of the guilt issue the prosecutor was guilty of other misconduct and that the trial court erred in its rulings during the cross-examination of various defense witnesses. Several assignments of error are claimed, and a review of the record indicates that a valid argument can be made substantiating the claim of impropriety. On each occasion the prosecuting attorney went far afield to discredit the witnesses in question. There is grave doubt that the questions were asked in good faith, for in those cases wherein he received a negative reply no attempt was made to prove the truth of the matters asserted in the questions. (See *People* v. *Evans* (1952) 39 Cal.2d 242, 248 [246 P.2d 636].) The record appears to support appellant's claim that the questions were asked for the purpose of getting before the jury the facts inferred therein, together with the insinuations and suggestions they inevitably contained, rather than for the answers which might be given. (See *People* v. *Perez* (1962) 58 Cal.2d 229, 240-241 [23 Cal.Rptr. 569, 373 P.2d 617]; *People* v. *Lo Cigno* (1961) 193 Cal.App.2d 360, 388 [14 Cal.Rptr. 354].) Also included in this group of cited errors were questions to which the prosecution received an affirmative reply but which were erroneous because they constituted an improper method of discrediting the witness. Coming within this classification were questions which elicited the fact that appellant had previously been convicted of an unrelated misdemeanor. (Cf. *People* v. *Duvernay* (1941) 43 Cal.App.2d 823, 827 [111 P.2d 659].) Since conviction of a felony is the only prior

conviction which may be shown to impeach a witness (*People* v. *Vanderburg* (1960) 184 Cal.App.2d 33, 40 [7 Cal.Rptr. 287]), this was clearly error, but the trial court overruled the objection thereto. However, each of the witnesses to whom this discussion is applicable appears to have been thoroughly discredited by other and proper methods, so the errors herein discussed were hardly prejudicial.

 Appellant also assigns as error the alleged prejudicial misconduct of the prosecuting attorney in propounding questions which were declared by this court to have constituted prejudicial error when it reversed the original judgments herein (*People* v. *Hamilton, supra,* 55 Cal.2d 881). In that decision we held that inasmuch as the defense was predicated upon appellant's claim that Estella had requested him to come to her home on the night of the homicides, it was proper for the prosecution to rebut by introducing evidence of Estella's state of mind inconsistent with such an invitation. For such purpose, it was held that declarations of fear, made under circumstances that would guarantee probable trustworthiness, could be admitted to indicate such a state of mind. But the judgment was reversed because the prosecution, in the guise of introducing evidence of such state of mind, got into the record the hearsay statements of several witnesses who testified not only as to Estella's statements of fear, but as to her statements (made out of the presence of appellant) of her reasons for fearing appellant. In short, the witnesses had been allowed to testify to Estella's hearsay accusations of appellant's past conduct, his threats, and acts of brutality.

At the second trial, in order to make it possible for the prosecution to ask questions concerning Estella's declarations of her fear without the risk that the witnesses would reply with Estella's declarations of appellant's past conduct, the defense stipulated that the prosecution might "propound leading questions."[2] Appellant now submits that the prosecu-

---

[2] The conversation leading up to the stipulation took place outside of the courtroom, immediately after the defense rested, and is not in the record. Evidently the prosecution proposed the stipulation, for the record shows that before calling his first rebuttal witness the prosecuting attorney made the following representation to the court:

"MR. VUKOTA: Your Honor, may it please the Court, during recess I had an opportunity to talk with counsel for the defendant, Mr. Gasparich, and at that time with reference to the rebuttal, some of the rebuttal witnesses that I put on the stand he agreed it would be permissible for me at times to propound leading questions for reasons known to the Court because of the law as it now exists.

"THE COURT: I think I understand.

tion showed bad faith in framing those leading questions. The record so indicates. The witness need only have been asked whether or not Estella had ever expressed fear of the appellant. A simple affirmative answer would have been sufficient, and it would seem that the stipulation was made for the purpose of having the examination conducted on that simple basis. However, the prosecuting attorney, even after receiving a simple assent to his simple initial query, proceeded to propound additional questions to each witness in a form which, while warning the witness not to state what Estella said regarding "what the defendant did" to her, actually called for an answer indicating Estella had accused the appellant of doing something. Even where the question did not call for such an answer, it implied or insinuated such a fact.[3] And in at least one instance, a question was asked which was clearly erroneous under the rules announced in the former opinion. (*People* v. *Hamilton*, *supra*, 55 Cal.2d at pp. 895-898.) Thus the witness was asked, "Did you see bruises on Estella while she was married to the defendant?" An objection to that question was overruled. With the exception of this last question, the court's rulings prevented the answers from coming into the record, and it is doubtful that the mere asking of the questions raised a sufficient inference of brutality practiced by appellant on Estella to warrant a conclusion that those questions were prejudicial. This seems particularly so since under either theory of the case, the jury in all probability would have returned a verdict of murder in the first degree. But the fact remains that the prosecuting attorney was here once again guilty of what must be classified as intentional misconduct.

██ The last assignment of error on this phase of the trial relates to the instructions given by the court at the conclusion of the trial of the guilt issue. Appellant contends that the court exerted undue influence on the jury, and emphasized the prosecution's theory, by repetitive instructions given during that body's deliberations. The record indicates that the court did emphasize in its instructions the

"Mr. Vukota: Is that right, Mr. Gasparich?
"Mr. Gasparich: That is absolutely correct.
"Mr. Vukota: So I just want it for the purpose of the record."
[3] When objections were made and sustained to such questions the prosecuting attorney demonstrated that he knew very well how to ask the simple leading questions, contemplated by the stipulation, to elicit the simple answers that Estella had stated that she feared appellant, or that she was afraid that he was going to kill her. Thereafter, with other witnesses, however, the prosecuting attorney continued to ask the improper questions until stopped by the court.

prosecution's theory of first degree murder predicated on a killing while engaged in a felony (unlawful entry of decedent's home), as compared to the instructions given on the defense theory that the decedent invited appellant to her apartment. But even if it were error to thus overemphasize the prosecution's theory, such error was not prejudicial. Although the briefs of the parties infer that the theories of the prosecution and of the defense were widely divergent, there is not a great legal distinction between them. Factually, the prosecution would have had the jury believe that appellant's intent when he entered the apartment constituted burglary, and that hence his illegal motive would turn an accidental killing into first degree murder. The defense claimed that appellant's motive in breaking and entering (an admitted fact) was innocent because it was predicated on Estella's invitation. But the defense also admitted that after the original invitation was canceled, via telephone, appellant went to his apartment and obtained the weapon with which at least one of the killings was accomplished, then attempted entry to the scene of the killings by subterfuge, and on being refused admission kicked in the window and thus gained entry. It is difficult to see how the emphasis of one theory over the other could possibly prejudice appellant. Even under his theory his actions indicated premeditation, and hence first degree murder.

 This is a fair summary of the errors that occurred on the trial of the guilt issue. Such errors were serious, and several of them consisted of what must be held to be intentional misconduct on the part of the prosecuting attorney. But section 4½ of article VI of the Constitution provides that a reversal shall not follow "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." Undoubtedly the trial court committed several errors, and unquestionably the prosecuting attorney presented legally objectionable evidence, and improperly used devious methods on cross-examination of defense witnesses that were highly improper, and called for a stern rebuke by the trial judge. It would be an impeachment of the legal learning and intelligence of counsel for the People to intimate that he did not know that such conduct on his part was wholly unjustifiable and calculated to unduly prejudice the jury against the accused. To indulge

a contrary view is to ignore human experience and the dictates of common sense.

Pertinent to the situation with which we are here confronted are the comments of the court in *People* v. *Black* (1925) 73 Cal.App. 13 [238 P. 374], wherein the following appears at pages 43-44: "[W]e feel impelled to direct the attention of district attorneys and trial judges to the frequent occasion which is thrust upon us to save judgments of conviction by means of the provisions of section 4½ of article VI of the constitution. It seems evident that the prosecutors of the state, and possible that the trial judges, are conducting criminal cases with an eye to the saving grace of the section. It should be manifest that such a course is improper. In the performance of their respective duties incident to trials, the existence of the section is of no concern to those officers. That part of the organic law of the state is of interest, so far as its application is concerned, if we except proceedings on motion for a new trial (see *People* v. *Tomsky,* 20 Cal.App. 672 [130 P. 184]), only to the courts of review. District attorneys and trial judges should conduct the trial of criminal cases exactly as if the section did not exist. Such a course, if faithfully and diligently pursued, will lessen the number of appeals, will shorten the time necessary for the consideration of appeals which are taken, will lessen the number of retrials by superior courts, and will conduce to the general dispatch of business in both trial and appellate courts."

Notwithstanding the errors committed by the trial court and by the prosecuting attorney, we cannot be indifferent to the constitutional mandate which was adopted by the people of the state and stands as a declaration by them of public policy under which as therein declared, "No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the *court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."* (Italics added.) (Cal. Const., art. VI, § 4½.)

In *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], this court reviewed the history and interpretation of the constitutional provision since its adoption in 1911, and commenc-

ing at page 834, we said: ''The constitutional amendment added a new concept calling for a determination by the court that the alleged error resulted in 'a miscarriage of justice.' To this end the appellate court was required to review the evidence so as to form an 'opinion' as to whether the assigned errors had affected the outcome of the case resulting in 'a miscarriage of justice.'

''. . . . . . . . . . . .

''. . . In determining the meaning of this phrase, the reviewing courts have stated the test to be applied in varying language. Emphasis in the main, however, has been placed on the constitutional requirements of a fair trial and due process, which emphasis is found in decisions resulting in reversals [citing cases]. . . . and in *People* v. *Kelso, supra* [25 Cal.2d 848 (155 P.2d 819)], at page 853, it was said *that there should be no reversal where 'it appears that a different verdict would not otherwise have been probable.'* '' (Italics added.)

Continuing at page 837, this court epitomized the test as being '' '. . . that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' . . . Nevertheless, the test, as stated in any of the several ways, must necessarily be based upon *reasonable probabilities rather than upon mere possibilities;* otherwise the entire purpose of the constitutional provision would be defeated.'' (Italics added.) (See also *People* v. *O'Bryan* (1913) 165 Cal. 55 [130 P. 1042].)

If these tests be applied to the record here involved it cannot be held that on the trial of the guilt issue a result more favorable to the appellant would have been reached in the absence of the errors of the trial court and the misconduct of the prosecuting attorney. The errors committed on this phase of the trial, whether considered singly or in combination, were of minor import when viewed in the light of the overwhelming evidence that appellant committed these premeditated murders. That appellant was guilty of having committed the charged offenses was practically proved not only by convincing evidence produced by the prosecution but by appellant's own evidence. The evidence quite conclusively shows that the two killings were not only committed during the perpetration of a felony, but also that they were premeditated crimes. It must be held, therefore, that under the evidence, the errors complained of did not result in a miscarriage of justice so far as the determination of guilt is concerned.

### The penalty phase of the trial.

But the same cannot be said as to the penalty phase of the trial. Here the errors were not only serious but also must be held to have been prejudicial.

The first of these errors relates to the actions of the trial court in discharging one of the regular jurors and substituting an alternate during the trial of the penalty issue. In our opinion, under the circumstances, this constituted not only error but prejudicial error.

This error occurred under the following circumstances. Because it was anticipated that the trial would be a protracted one, two alternate jurors were selected, and seated near the regular jurors in a position from which they could and did hear and observe the entire proceedings. The trial of the issue of guilt proceeded with the regular 12 jurors, and resulted in a verdict of first degree murder. The alternates did not participate in this determination. It should be noted that during their deliberations on this first phase of the case the jury was twice returned to the courtroom for further instructions, on which occasions several jurors (including Mrs. Julia C. McCullough, the juror who was subsequently removed by the court) asked several questions indicating that she and they were giving serious consideration to a verdict of second degree murder. After the verdict on the issue of guilt, trial of the penalty issue was commenced before the same 12 jurors, and the alternates. During that phase of the case, and while a defense witness was testifying to the minimum time which must be served under a life sentence for first degree murder, Mrs. McCullough asked the court for permission to ask a question. The court allowed her request, and she asked several questions (which the court allowed the witness to answer) indicating her concern with the dates and circumstances under which the Adult Authority might consider parole where there were prior convictions. During cross-examination of the same witness, Mrs. McCullough advised the court that she was mixed up on the matter of whether such a prisoner could be released in seven years if he had prior felony convictions. In attempting to straighten out this matter the court asked the witness several questions and received proper answers. Thereupon Mrs. McCullough stated that she was still confused, and, during such discussion remarked that she had read the Penal Code. The court advised her that she should not read the code, but was bound to accept the law as it would be subsequently ex-

plained to the jury. Mrs. McCullough stated that she planned to do just that. All of this took place in open court, during the examination of the witness, and in the presence of the entire jury. During the following recess the prosecution moved the court to dismiss Mrs. McCullough on the ground that her questions indicated that she had read and misunderstood the Penal Code, had formed certain views which she would retain and urge on the other jurors, *and had disclosed her opposition to a verdict imposing the death penalty*. The defense opposed the motion. The next morning, over the objection of the defense, the trial judge had Mrs. McCullough brought into chambers where (in the presence of appellant and his counsel) he proceeded to interrogate the juror. Such interrogation brought to light the facts that: during the noon recesses throughout the trial Mrs. McCullough had extra time on her hands and had utilized the same by browsing in the public library; that she had no intention of trying to interpret the law, or to learn it as it applied to this case, but that she became interested in a handbook on law written for laymen, and from that in the Penal Code; that she had read the latter in its entirety; that she did not pretend to understand the code, and her only motive in reading it was that she felt that a person should be as well informed as possible; that she was not looking for those parts which applied to the issues discussed in court, but had read the entire code from beginning to end; that she had talked to no one else about having read the code or what she found therein; that this was her first service as a juror, and the first time she had ever been in court; that she was still confused, and felt that many of the other jurors were also confused on the subject under discussion on the previous day, but did not intend to discuss it with anyone.

The court thereupon discharged Mrs. McCullough and ordered her replaced by one of the alternate jurors, citing as its authority section 1089 of the Penal Code.[4] Upon indi-

[4] In addition to providing for the selection of alternate jurors, that section provides: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, . . . as though he had been selected as one of the original jurors." The history of this statute, including its various amendments, may have some bearing on the precise question presented, and is discussed below.

cating what his ruling would be, the trial judge asked defense counsel if he desired to make a motion for mistrial. The latter answered that he did so move, and asked the court if his order discharging Mrs. McCullough reflected a finding of misconduct on her part. The court replied in the affirmative, and defense counsel thereupon argued that such misconduct could only be predicated on the reading of the Penal Code, and that since there was no showing as to when the juror read the code, the misconduct which the court found went equally to her ability to deliberate on the issue of guilt, and therefore constituted adequate ground for a mistrial. The court denied the motion, and in so doing indicated that it had been inadvertently misled by defense counsel's question, in that it did not find the juror to have been guilty of any misconduct ''until she undertook to look at a law book,'' and that ''she has only now become unable to perform her duty.'' Defense counsel then pointed out that the examination of the juror by the court had failed to indicate when the former had read the Penal Code, and specifically requested that the juror be recalled for the sole purpose of determining that fact. The request was denied.

On this appeal the defense contends that the matters which resulted in the dismissal of the juror did not constitute ''good cause'' as contemplated by the statute, and further, that even if good cause for discharging the juror did exist, the facts on which the trial court made that finding required that it grant the motion for mistrial. That argument may be summarized as follows. The code section sets forth four distinct grounds for discharging a juror and substituting an alternate.[5] Only one of those grounds is involved here; i.e., ''good cause shown to the court [that the juror] is found to be unable to perform his duty.'' The showing here is that by reason of reading the Penal Code (from innocent motives) the juror has become confused as to the applicable law, but has recognized her duty to accept the court's explanation of the law, and has expressed her willingness to be bound thereby. Such facts, standing alone, do not show an inability to perform her duties as a juror, since the mere reading of the code is not to be equated with a failure to accept the court's instructions as to the law. Nor does mere confusion caused by prior reading of the code indicate that the juror has for-

---

[5] These are: (1) death or (2) illness of the juror, (3) a finding (on good cause shown) that the juror is unable to perform his duty, and (4) the juror's request to be discharged for good cause shown.

mulated an opinion as to what the law is or should be, or that she will attempt to urge any such preconceived views upon other members of the panel. If it be conceded that the trial court is vested with a certain amount of discretion in its determination of whether the facts constitute an inability to perform the functions of a juror, that discretion is not sufficiently broad to authorize the court to make such a determination from the facts which it then had before it.

In making the latter argument appellant stresses the fact that the history of Penal Code section 1089 indicates a consistently recurring refusal by the Legislature to authorize unrestricted substitution of jurors, or allow an unlimited discretion in that regard. That history indicates that prior to the adoption of the code section in 1895 it was necessary to declare a mistrial in the event that a juror became incapacitated or disqualified (*People* v. *Peete,* 54 Cal.App. 333, 365 [202 P. 51]); that the code section as originally enacted provided only for the substitution of an alternate when a juror was incapacitated by death or illness; that eventually under this original section, in 1930, the question was presented as to the propriety of making such a substitution when one of the regular jurors asked to be discharged because she knew and considered herself prejudiced against some of the witnesses who appeared and testified (*People* v. *Howard,* 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385]); that it was then held that the substitution under such circumstances was not within the purview of the statute;[6] that thereupon a bill was introduced in the Legislature (Senate Bill No. 606, January 22, 1931) to provide an amendment that would allow the court to substitute an alternate for a regular juror "for any reason which in its discretion it shall deem sufficient . . ."; that such proposal was defeated, and in 1933 section 1089

---

[6] The *Howard* decision held that the action of the trial court in discharging the juror was contrary to the statute, but that no prejudice resulted for the reason that a defendant, although entitled to trial by a jury of 12 impartial persons, is not entitled to trial by any particular juror (citing the previous case of *People* v. *Durrant,* 116 Cal. 179, 199 [48 P. 75]). The defendant in the *Howard* case was unable to show any prejudice that arose from the substitution of jurors, and thus appellant here is able to contend that *Howard* is not controlling except for the purpose of showing the trend of the statutory provisions. Furthermore, in *Howard* this court modified the judgment of first degree murder to second degree, thus decreasing the effect of any prejudice that may have existed. Justice Richards dissented, and would have reversed on the ground that the substitution of the juror constituted a denial of defendant's constitutional rights.

was amended to allow for substitution when "a juror requests a discharge and good cause appears therefor," thus providing for the situation which was involved in the *Howard* decision;[7] that in 1948 the case of *People* v. *Burns,* 84 Cal. App.2d 18 [189 P.2d 868], presented a question of the propriety of substituting an alternate juror for a regular member of the panel who was found, after the commencement of the trial, to be under indictment for a felony;[8] that the decision in that case caused a further legislative study of the matter, and in 1949 the code section was again amended to its present form; that the entire history indicates a definite unwillingness on the part of the Legislature to either adopt a practice of unrestricted substitution of jurors or to authorize a wide discretion in the trial court beyond that required to apply the facts shown to any one of the four causes for substitution which are set forth in the statute.

There is merit in the appellant's position. Certainly, the mere reading of the Penal Code, for the sole purpose of becoming better informed, cannot, without more, be either misconduct or an act which results in inability to perform the duties of a juror. If the juror had given any indication that she would substitute her knowledge (gained from reading the code) for the instructions of the court, or would convey such knowledge to the other jurors, then it might have been said that she was incapable of performing her duties. But there was no such indication. In fact, it was only discovered that Mrs. McCullough had been reading the code because she was desirous of having the court advise her as to the meaning of the law. There was no basis at all for the trial court's determination that Mrs. McCullough was guilty of misconduct, or was unable to perform her duties. Thus the dismissal of this juror was error and in violation of the restrictions imposed by section 1089 of the Penal Code. All of the cases cited above clearly indicate that this is so.

Some of the cases cited, although holding that the substitution was error, held it nonprejudicial.

Respondent relies on the *Howard* case and on *People* v. *Abbott,* 47 Cal.2d 362 [303 P.2d 730]. The decisions in each of those cases turned upon the fact that no prejudice had been

---

[7] That provision remains in the code section as the fourth of the alternate grounds on which the court may substitute a juror during the trial.

[8] The *Burns* decision, like *Howard,* held the substitution to have been irregular because not authorized by the statute, but did not reverse on the ground that appellant was unable to show that any prejudice resulted from the change of jurors.

shown. The other cases decided since the 1949 amendment deal with facts which obviously constituted an inability of the juror to perform his duties. (See *People* v. *Taylor,* 189 Cal.App.2d 490 [11 Cal.Rptr. 480]; *People* v. *Green,* 47 Cal.2d 209 [302 P.2d 307]; *In re Devlin,* 139 Cal.App.2d 810 [294 P.2d 466].) It cannot be said that because a juror has read a code, become confused thereby, requested the court to explain the law to her, stated that she will accept the explanation as given to her by the court, and will not communicate what she has read to the other jurors, she has shown any inability to perform her duty as a juror. It is significant that the trial court herein, when granting the motion to discharge Mrs. McCullough, did not first place its decision on the basis of her inability to perform her duty as a juror, but predicated the order of dismissal upon some imagined misconduct. Even when he reconsidered, the judge spoke of inability to perform, but continued to use language of misconduct. Section 1089 does not provide that misconduct of a juror shall be a ground for substituting an alternate. If the judge believed the juror had been guilty of misconduct, then he should have granted the motion for mistrial (at least insofar as the penalty issue was concerned.) If he did not so believe, there was no room for a finding that she was unable to perform her duties. It follows that the substitution was not within the purview of the code section, and hence constituted error.

Respondent urges the *Howard* case as authority for the contention that an irregularity in the discharge of a juror and substitution of an alternate may constitute error, but is not prejudicial. Neither the *Howard* decision, nor any other case cited, goes that far. The most that can be said about the cited cases is that they hold that *in those cases* the error was not shown to be prejudicial. For example, in *Howard* the discharged juror had expressed a prejudice against two defense witnesses. Thus the substitution of an alternate in his place was favorable to the defense. In *Abbott,* the juror was discharged because he worked in the same office as defendant's brother, although he did not know that individual by sight before he was pointed out at the trial. The trial judge stated, at the time of making the substitution, that he was doing so only because of the proximity of the juror and defendant's brother. There was no showing that the juror would have been more favorable to one side or the other. The instant case presents an entirely different situation. Here, the prosecution moved for the substitution of the

alternate for Mrs. McCullough on the stated ground that she "had disclosed her opposition to a verdict imposing the death penalty." Thus, her disqualification could only be beneficial to the prosecution and prejudicial to the defense. While it has been said repeatedly, in the cases cited above, that a defendant is not entitled to be tried by a jury composed of any particular individuals, but only by a jury composed of qualified and impartial jurors, this does not mean that either side is entitled to have removed from the panel any qualified and acting juror who, by some act or remark made during the trial, has given the impression that he favors one side or the other. It is obvious that it would be error to discharge a juror for such a reason, and that, if the record shows (as it does here), that, based on the evidence, that juror was inclined toward one side, the error in removing such a juror would be prejudicial to that side. If it were not, the court could "load" the jury one way or the other. That is precisely what occurred here. The juror asked, in good faith and in order to be instructed by the court, questions which indicated that (temporarily at least) she was considering the probability of a life sentence. To dismiss her without proper, or any, cause was tantamount to "loading" the jury with those who might favor the death penalty. Such, obviously, was prejudicial to appellant.

This error alone could well be held to have been prejudicial and to require a retrial of the penalty issue. Certainly, when considered with the other errors about to be discussed the cumulative effect of such errors must be held to be prejudicial.

 The next assignment of error relates to the question of whether the Legislature, in providing for the type of evidence that may be presented during the penalty phase of the trial intended not only to enlarge the scope of relevant admissible evidence, but intended as well to relax the ordinary rules of competency.[9]

---

[9] Penal Code section 190.1, after providing for the separation of the trial of the issues of guilt and the penalty, includes the following language: "Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty." That sentence has been interpreted to broaden and enlarge the permissible range of inquiry. (*People* v. *Jones*, 52 Cal.2d 636, 647 [343 P.2d 577]; *People* v. *Love*, 53 Cal.2d 843 [3 Cal. Rptr. 665, 350 P.2d 705].) The precise question presented here is whether it also relaxes the manner in which the relevant facts may be proved.

 Appellant claims, and respondent does not deny, that over defense objections the trial court allowed the prosecution to introduce the testimony of police officers and other witnesses relating to claimed extrajudicial admissions allegedly made by appellant, confessing the commission of or participation in prior crimes as to which no other evidence was produced. Appellant sets forth several examples of such testimony. Each constituted evidence that appellant had made such an extrajudicial admission concerning a crime as to which no corpus delicti was proved. In some instances it is claimed that the alleged crime was never proved in any other tribunal, and that the police, to whom the alleged confession was made, never filed charges. In no instance did the prosecution attempt to prove the fact of the crime in this proceeding.

 It is well settled that proof of prior crimes is admissible during the penalty phase of the trial (*People* v. *Pike*, 58 Cal.2d 70, 94 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Robillard*, 55 Cal.2d 88 [10 Cal.Rptr. 167, 358 P.2d 295]; *People* v. *Jones*, *supra*, 52 Cal.2d 636). But no case has as yet held that such could be proved by the introduction of evidence of an extrajudicial admission without proof *aliunde* that such a crime had been committed. It is unquestioned that during the guilt phase of a criminal trial such evidence is inadmissible in the absence of independent proof of the corpus delicti (*People* v. *Cullen*, 37 Cal.2d 614, 624 [234 P.2d 1]). Such is the common-law rule and rule of most other jurisdictions (7 Wigmore, Evidence (3d ed 1940) §§ 2070-2073, pp. 393-406; McCormick, Evidence (1954) § 110, pp. 229-231). But respondent argues that this rule is limited to the guilt phase of the trial because there the prosecution is required to prove guilt beyond a reasonable doubt; a requirement not applicable to the penalty phase of the trial (*People* v. *Purvis*, 56 Cal.2d 93 [13 Cal.Rptr. 801, 362 P.2d 713]; *People* v. *Howk*, 56 Cal.2d 687 [16 Cal. Rptr. 370, 365 P.2d 426]). Certainly, the previous decisions of this court do not go so far as to authorize otherwise incompetent evidence during the penalty trial. A review of the decisions most nearly in point would indicate that such is not the rule. In *People* v. *Green*, *supra*, 47 Cal.2d 209 (decided prior to the enactment of § 190.1) this court affirmed a judgment insofar as the conviction of first degree murder was concerned, but reversed and remanded for new trial on the question of penalty. In order to guide the lower court on the

retrial of that issue the opinion included a determination of the type of evidence which would then be admissible. It was said (at p. 236) : ''Where the question . . . is determined by the court . . . the hearing 'is not a trial in the full technical sense, and is not governed by the same strict rules of procedure as a trial,' and the court in aggravation or mitigation of the offense may consider matters not admissible on the issue of guilt [citations], *although the determination must be made upon 'competent evidence'* [citation]. Where the matter is to be determined by a jury, however, it would appear that the proceeding should be 'a trial in the full technical sense, and . . . *governed by the same . . . rules of procedure'* as *the trial of the issue of guilt.*'' (Italics added.) Shortly thereafter, in *People* v. *Purvis,* 52 Cal.2d 871 [346 P.2d 22], this court examined the same question in light of the provisions of section 190.1 which had been adopted in the interim. Therein it was stated, at page 884: ''Section 190.1 now sets forth the facts that may be proved in the separate proceedings on the issue of penalty, but it does not change the rule of the Green case as to how those facts are to be proved.'' On the second appeal in the *Purvis* case (*People* v. *Purvis, supra,* 56 Cal.2d 93), this court again reversed. At page 97 it was stated, ''Although there may be 'inquiry into relevant circumstances surrounding an earlier crime of which the defendant was convicted' (*People* v. *Purvis,* 52 Cal.2d 871, 881 [346 P.2d 22]), evidence of the earlier crime must meet the rules of admissibility governing proof of that crime or be otherwise properly admissible in the penalty proceeding.'' Although the *Purvis* decisions did not deal with the precise problem here presented, the language quoted is persuasive. It should be noted that the quoted portion of the second opinion authorizes inquiry into the circumstances surrounding an earlier crime of which the defendant *was convicted,* whereas in the instant case the inquiry went well beyond that limitation. As if to underscore the fact that it is the scope and not the manner of producing the evidence which has been relaxed, this court again spoke on the subject in *People* v. *Bentley,* 58 Cal.2d 458 [24 Cal.Rptr. 685, 374 P.2d 645]. There this court affirmed a death penalty judgment where the sole contention on appeal was that the trial court committed error in admitting evidence of a prior criminal venture committed outside the state. There it was said, at page 461: ''The People did not seek to prove these facts by inadmissible hearsay as in . . . [the two previous *Purvis*

cases], but by the testimony of eyewitnesses." ▮▮▮ The instant case is subject to even greater criticism than that inferred in the last quotation, for the prosecution not only sought to prove the commission of various crimes by hearsay, it made no claim that there had ever been a *conviction* for such crimes. It follows that the admission of the evidence was erroneous.

▮▮▮ The trial court also erroneously admitted, over objection, certain hearsay evidence such as the testimony of a parole officer who, while admittedly not knowing any of the facts of his own knowledge, was permitted to read into evidence from records of the Adult Authority a "Cumulative Case Summary," containing many statements regarding appellant's past actions and character as to which no other proof was offered. Apparently, this document, over defense objection, was allowed in evidence as a business record under section 1953f of the Code of Civil Procedure, but it failed to qualify thereunder. No testimony was offered as to the "mode of its preparation" or the "sources of information," whether the person who made the entries had personal knowledge as to the related facts, or even his identity. (5 Wigmore, Evidence (3d ed. 1940) § 1530, p. 376; McCormick, Evidence (1954) § 286, p. 602.) In *McGowan* v. *City of Los Angeles* (1950) 100 Cal.App.2d 386, 392 [223 P.2d 862, 21 A.L.R.2d 1206], it was said: "The statute [§ 1953f] does not change the rules of competency or relevancy with respect to recorded facts. It does not make that proof which is not proof. It merely provides a method of proof of an *admissible* 'act, condition or event.' It does not make the record admissible when oral testimony of the same facts would be inadmissible." (See also *Reisman* v. *Los Angeles City School Dist.* (1954) 123 Cal.App.2d 493, 506 [267 P.2d 36].) Essentially, the objectionable document was like an accident report compiled by a police officer at the scene—based on statements of others and his own conclusions—and inadmissible as a business record exception to the hearsay rule. (*McLean* v. *City & County of San Francisco* (1957) 151 Cal. App.2d 133, 143 [311 P.2d 158]; *Hoel* v. *City of Los Angeles* (1955) 135 Cal.App.2d 295, 309 [288 P.2d 989].)

▮▮▮ The admission of this evidence, too, was error. Appellant next contends that the court admitted irrelevant evidence which, even under the broadened scope authorized by section 190.1, had no probative value and was offered for the sole purpose of prejudicing the jury against appellant.

He also contends that much of such evidence consisted merely of the conclusions of the witness. As example he cites the testimony of a police officer who testified, over defense objection, that he had kept appellant's place of residence under surveillance and had seen persons whom he "knew" to be narcotic addicts enter the premises. Such testimony appears to be an effort to prove "guilt by association," and in that sense had no probative value. Whether or not the police officer's statement that the persons who entered appellant's place of residence were known addicts was the witness' conclusion is open to argument, and the record is not entirely clear on this point. As another example appellant cites testimony, allowed over defense objection, that appellant had been arrested when no charges were filed and he was subsequently released without further action. He argues that matters which bear on a defendant's "background and history" only by virtue of "conjecture, surmise or suspicion" should not be submitted to the jury in the rational determination of the penalty issue. (See *People* v. *Terry* (1962) 57 Cal.2d 538, 566 [21 Cal.Rptr. 185, 370 P.2d 985].)

Appellant vigorously maintains that this testimony, purportedly coming within the permissible range of broad inquiry as to his "background and history," was produced for the sole purpose of inflaming the minds of the jury against him. Under the rule of *People* v. *Love, supra,* 53 Cal.2d 843, at page 856, the "probative value and the inflammatory effect of proffered evidence must be carefully weighed," for the "determination of penalty, . . . like the determination of guilt, must be a rational decision." While the allegedly objectionable testimony here involved does not appear to be of the highly inflammatory nature of that considered in the *Love* case, its probative value was far less. No attempt had been made to show that appellant was a narcotic addict or that the "known" addicts who were seen to enter his place of residence went there for the purpose of purchasing narcotics. The whole tenor of the testimony was to create a suspicion that appellant might have been engaged in the illegal traffic because of the designated visitors, a point of "logical inference" according to the prosecuting attorney's final argument to the jury on the penalty phase of appellant's trial. This type of flimsy, speculative testimony should not have been admitted, and its admission was error.

Appellant next cites examples of further alleged misconduct on the part of the prosecuting attorney, occurring

during cross-examination of the appellant following his testimony as to what transpired during a particular shooting fracas. Over defense objection, the prosecuting attorney read to appellant a lengthy statement ostensibly prepared by appellant's parole officer and which contained many statements of criminal conduct with which the officer purportedly charged appellant during an oral interview relative to the incident. There was nothing to indicate that the officer knew the facts of his own knowledge or that appellant admitted any of these charges. No attempt was made to prove the truth of the charges or to substantiate them in any manner in contradiction of appellant's version of the altercation. After reading the document reciting the unsubstantiated charges, the single question asked of appellant was whether these things were said to him. Appellant responded that he did not remember what the parole officer had told him. A motion to strike was denied.

Appellant contends that in view of his direct testimony on the shooting incident, the prosecuting attorney had no reasonable cause to believe that appellant on cross-examination would admit having been told of these charges, an affirmation amounting to an adoptive admission, and that the prosecution's only purpose was to place before the jury statements of a third person not even shown to be the product of firsthand knowledge, which accused appellant of various heinous crimes. The prosecution argues the propriety of the procedure on the ground that if appellant had admitted the recital as set forth in the document, it may have constituted an admission by failure to deny. But since the probability of such an admission on the part of appellant was extremely remote, and no attempt was made to prove it by testimony of the parole officer, the conclusion inevitably follows that the prosecution was interested only in getting the contents of the document before the jury under the guise of legitimate cross-examination. Unquestionably, it is highly improper for the prosecution to pursue a line of interrogation which, by direction or indirection, has as its only purpose the implanting of damaging facts against the defendant which cannot be legitimately established. (*People* v. *Perez, supra,* 58 Cal.2d 229, 240-241; *People* v. *Lo Cigno, supra,* 193 Cal.App.2d 360, 388; see also *People* v. *Evans, supra,* 39 Cal.2d 242, 248.) The harmful effect of such procedure stems from the fact that the deputy district attorney may well be assumed to be a person of fair standing before

the jury, and the members thereof, knowing that he is the representative of the people of the state in an important capacity, would rely upon his integrity, assume he was acting in good faith, and would not engage in a cross-examination resting on an assumption of facts which he was not prepared to prove should their verity be denied. (See *People* v. *Williams* (1951) 104 Cal.App.2d 323, 330 [231 P.2d 544]; *People* v *Pang Sui Lin* (1911) 15 Cal.App. 260, 262 [133 P. 582].) This was another example of clear misconduct on the part of the prosecuting attorney.

Other examples of alleged misconduct concern questions asked of defense witnesses as to whether they had knowledge of certain degrading facts regarding appellant, in the absence of any intent by the prosecution to prove the existence of such facts. Included were intimations that appellant had been convicted for hijacking whiskey, had engaged in certain immoral acts with a fellow prisoner, and had fraudulently claimed that his wife was on relief—as to none of which was any proof offered. The objection that such queries were misleading and assumed facts not in evidence was unavailing. On at least two of these occasions, the prosecuting attorney stated, in the presence of the jury, that the facts recited in the questions were true. Each defense witness denied all knowledge of such facts and the prosecution made no attempt thereafter to prove them. The Attorney General, on appeal, makes little effort to deny the impropriety of such procedure but simply argues that the objectionable form of the interrogation was not prejudicial.

 Appellant finally specifies as error the trial court's failure to give certain instructions proposed by him on the penalty phase of the trial. A review of the instructions in their entirety indicates that the matters contained in the refused instructions were either adequately covered in the general instructions or were incorrect statements of the law. In the latter category, appellant requested the court to instruct the jury in substance that if there was any uncertainty on its part as to which of the penalties to impose, the lesser penalty should be imposed. But the "jury has absolute discretion in fixing the penalty and is not required to prefer one penalty over another." (*People* v. *Purvis, supra,* 56 Cal.2d 93, 96.) Nor was the court required to give the amplified instruction on parole proposed by appellant, declaring that eligibility for parole does not necessarily mean release from prison at any specified time but

only means consideration thereof. Unquestionably information as to parole procedure and practice assists the jury in assessing the significance of a life sentence and exercising its discretion in choosing between the alternative penalties. (*People* v. *Riser* (1956) 47 Cal.2d 566, 582 [305 P.2d 1].) Here the jury was properly instructed on the seven-year parole provision in the terms of Penal Code section 3046. (*People* v. *Friend* (1957) 47 Cal.2d 749, 755 [306 P.2d 463].) In addition, the matter of "minimum, average, and maximum terms actually being served for first degree murder in California" was thoroughly explored by the prosecution and the defense both in the presentation of evidence and argument to the jury. (*People* v. *Purvis, supra,* 52 Cal.2d 871, 884.) Under these circumstances appellant's proposed instruction was only cumulative in effect and would have no essential value in the jury's determination of the penalty issue.

Thus, on the penalty phase of the trial, serious and substantial errors were committed. The trial court erroneously removed a qualified juror who, according to the prosecuting attorney, based on the evidence and the law, had indicated some doubts as to whether the death penalty should be imposed. In addition a considerable amount of inadmissible evidence was admitted, and the prosecutor was guilty of serious misconduct that must be held to have been intentional and premeditated. The errors as to the admissibility of evidence and misconduct all directly related to the character of defendant. On the other hand, there is ample evidence that defendant was a man of bad character and had a long line of previous convictions. That evidence would have justified the jury in imposing the death penalty.

Under these circumstances were these errors prejudicial within the meaning of article VI, section 4½, of the Constitution? How should that article be applied to the penalty phase of the trial? These are the questions with which we are presented.

Article VI, section 4½, of the Constitution provides that a reversal shall not follow because of error "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." In *People* v. *Watson, supra,* 46 Cal.2d 818, 836, not a death penalty case, the court after an exhaustive analysis said as to the question of guilt, ". . . the test generally applicable may be stated

as follows: That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'' That test has many times been restated.

As to the issue of guilt, that test is quite clear in its application. The appellate court is required to read the record, determine what errors were committed, and then try to tell from that record whether, had those errors not occurred ''it is reasonably probable that a result more favorable to the appealing party would have been reached.'' We have already applied that test to the guilt phase of the trial and have held, in view of the overwhelming evidence of guilt, that in spite of serious errors and misconduct, had those errors not occurred, it is not reasonably probable a different result would have occurred.

But in deciding the effect of the errors on the penalty phase of the trial the problem is not so simple. Here, according to the mandate of section 190.1 of the Penal Code the ''determination of the penalty of life imprisonment or death shall be in the discretion'' of the jury. There are no basic guide lines to assist the jury in coming to that determination. On the trial of the guilt issue the jury is bound by rules of law laid down by the court in its instructions. But on the penalty phase of the trial there are no such guide lines. The jury does not have to find ameliorating circumstances to impose life imprisonment, nor need it find aggravation to impose the death penalty. The choice between the two rests in the absolute discretion of the jury. Conceivably, an error that we would hold nonprejudicial on the guilt trial, if a similar error were committed on the penalty trial, could be prejudicial. Where, as here, the evidence of guilt is overwhelming, even serious error cannot be said to be such as would, in reasonable probability, have altered the balance between conviction and acquittal. But in determining the issue of penalty, the jury, in deciding between life imprisonment or death, may be swayed one way or the other by any piece of evidence. If any substantial piece or part of that evidence was inadmissible, or if any misconduct or other error occurred, particularly where, as here, the inadmissible evidence, the misconduct and other errors directly related to the character of appellant, the appellate court by no reasoning process can ascertain whether there is a ''reasonable

probability'' that a different result would have been reached in the absence of error. If only one of the twelve jurors was swayed by the inadmissible evidence or error, then, in the absence of that evidence or error, the death penalty would not have been imposed. What may affect one juror might not affect another. The facts that the evidence of guilt is overwhelming, as here, or that the crime involved was, as here, particularly revolting, are not controlling. ██ This being so it necessarily follows that any substantial error occurring during the penalty phase of the trial, that results in the death penalty, since it reasonably may have swayed a juror, must be deemed to have been prejudicial. This rule of law has been hinted at, if not decided, in prior cases. In *People* v. *Linden* (1959) 52 Cal.2d 1, 27 [338 P.2d 397], it was said that error and misconduct in the penalty trial ''implicitly invites reversal in every case. Only under extraordinary circumstances can the constitutional provision [art. VI, § 4½] save the verdict.'' Such extraordinary circumstances were found in the *Linden* case. But in *People* v. *Love*, 56 Cal.2d 720, 733 [16 Cal. Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], and in *People* v. *Terry, supra*, 57 Cal.2d 538, 569, the language from the *Linden* case above referred to was quoted, and the death penalty judgment was reversed.

██ The cumulative effect of the errors here involved must be held to have been prejudicial. They all had a tendency to mislead the jury. The prosecutor obviously overplayed his hand. He had a case which should have resulted in a conviction and one which, in the absence of error, might have resulted in a death sentence. In each phase of the trial he was not content to follow the rules of law but proffered evidence he knew or should have known was inadmissible, and was guilty of the various acts of misconduct already described. Since many of these errors related directly to the character and background of this appellant, it must be held that they reasonably had a tendency to mislead the jury and that it is reasonably probable that had they not occurred a different result may have been reached.

██ Prejudice is derived from the fact that the jury, in most cases, has, and should have, faith in the prosecutor. When, as here, he takes advantage of his position by producing inadmissible evidence, and by asking questions that assume facts that he either knows or should know to be untrue, or which he cannot prove by admissible evidence, he has denied to the defendant that fair trial provided by our

federal and state Constitutions. (See *People* v. *Lyons,* 47 Cal.2d 311, 318-319 [303 P.2d 329]; *People* v. *Talle,* 111 Cal.App.2d 650 [245 P.2d 633]; *People* v. *Pang Sui Lin, supra,* 15 Cal.App. 260.)

Respondent attempts to excuse the admitted errors on the ground that the prosecution and defense were very vigorous, and that human nature being what it is some error was inevitable. It is argued that where, as here, the evidence of guilt is overwhelming, and where, as respondent assumes, the appellant is a person who justly deserves the death penalty, this court should overlook the errors. The short answer to this contention is that neither the prosecution nor this court is entitled legally to make the determination of whether appellant is to live or be put to death. The determination of what penalty shall be imposed rests exclusively with the jury. This court's authority begins and ends with a determination of whether the jury was allowed to make that determination without illegal or improper interference. The province of the jury was clearly invaded in the instant case. Since this is so the judgment imposing the death sentence must be again reversed, and the case remanded for a new trial on the issue of penalty.

We are well aware that this appellant has already been afforded two trials on the issue of penalty, and that both juries have imposed the death penalty. We are also well aware that a new trial on the issue of penalty will be time-consuming and expensive. But such factors are not controlling. On both occasions misconduct occurred and errors were committed, misconduct and errors that were of such a nature that they denied appellant the fair trial guaranteed to him by the federal and state Constitutions. These errors and misconduct were not minor or technical. They were substantial. This being so, a reversal is called for.

The judgment and order denying the motion for a new trial are affirmed as to count one, and as to the issue of guilt on count two, but they are reversed on the issue of penalty as to count two, and the cause is remanded for retrial and redetermination of the question of penalty only as to count two, and for the pronouncement of a new sentence and judgment in accordance with such determination and the applicable law.

. Gibson, C. J., Traynor, J., and Tobriner, J., concurred.

SCHAUER, J., and McCOMB, J., Concurring and Dissent-

ing.—Because it does not appear to us that the errors complained of have resulted in a miscarriage of justice on either the issue of guilt, or that of penalty, we would affirm the judgments and orders of the trial court in their entirety as to both count one and count two. (Cal. Const., art. VI, § 4½.)

Appellant's petition for a rehearing was denied August 7, 1963.