114 Cal.Rptr.2d 680 (2001)
94 Cal.App.4th 998
The PEOPLE, Plaintiff and Respondent,
v.
Felix D. HIGHTOWER, Defendant and Appellant.
No. A081424.
Court of Appeal, First District, Division Four.
December 20, 2001.
Review Denied March 20, 2002.[**]
*681 David Y. Stanley, Truckee, for Appellant.
*682 Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Senior Assistant Attorney General, Michael E. Banister, Deputy Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, for Respondent.
Certified for Partial Publication.[*]
SEPULVEDA, J.
Defendant Felix D. Hightower was convicted of the murder of his mother and of arson in connection with a fire that led to the discovery of her body. In a prior opinion we affirmed his conviction over his contention that the trial court erred by excusing a juror who professed a categorical disbelief that a son could murder his mother under the circumstances shown by the evidence. The Supreme Court granted review pending its decision in People v. Cleveland (2001) 25 Cal.4th 466, 106 Cal. Rptr.2d 313, 21 P.3d 1225 (Cleveland). The court has now retransferred this matter to us for consideration in light of that decision. We again conclude that no error appears, and that the conviction must be affirmed. We will, however, modify the sentence in accordance with another of defendant's arguments.

BACKGROUND
Shortly after 6:00 o'clock on the morning of Monday, September 3, 1990, a fire broke out in the apartment occupied by defendant and his mother, Mary Hightower. A neighbor, seven years old at the time of the fire, testified that he was awakened by sirens and looked out his window to see defendant running from the alley in front of the apartment. Firemen entering the apartment found Ms. Hightower and her dog, both dead, in the bedroom. Ms. Hightower had been stabbed or cut approximately 63 times and had died as a result of the stabbings. Her death occurred one to three days before the fire. The fire had been set deliberately on the bed and at another point near the bed.
Ms. Hightower was last seen alive on Friday evening, August 31, when she agreed to join friends the following morning on a fishing and pea-picking trip. When the friends came by to pick her up on Saturday morning, she did not answer her door. Her car was missing, though she herself did not drive and typically got defendant to drive her.
At about 6:30 on Saturday morning, defendant presented himself at an Oakland hospital emergency room with fresh cuts on his hands. He told the triage nurse that he had cut himself with a knife about an hour earlier. He did not appear to be under the influence of drugs. He received 17 stitches and was released. Blood later found at the murder scene would prove to have genetic characteristics that did not match Mary Hightower's blood and did not match 99.75 percent of the African-American population, but did match defendant's blood.
On Saturday morning a friend of Mary Hightower's went by her apartment and saw defendant and a stranger loading a television set into a truck. When the friend asked appellant where his mother was, he replied that she had gone to pick up a check. Later that day, Ms. Hightower's sister questioned defendant about his mother's whereabouts. Defendant nervously said that she had gone fishing with a friend. Defendant struck the sister as "jumpy" and "nervous." He looked like he had been using drugs.
There was testimony that defendant had a "drug problem," had previously taken a television from his mother's house, and had been heard arguing with her about drug use, missing items, and money. Witnesses also reported that defendant and his mother seemed to have a close relationship, that they generally got along and cared for one another as son and mother, that they had never been seen engaging in *683 any physical conflict, and that their arguments were a normal parent-child thing.
At the conclusion of a first trial in 1993, a jury found defendant guilty of murder and arson and found the allegation of weapons use true. This court reversed the judgment on grounds not relevant here. (People v. Hightower (1996) 41 Cal.App.4th 1108, 49 Cal.Rptr.2d 40.)
On remand, the matter was again tried to a jury, which again convicted defendant of second degree murder and arson and found true the allegations that defendant used a deadly weapon and acted with intent to inflict great bodily injury. The court initially sentenced defendant to a term of 19 years to life, consisting of 15 years to life on the murder charge, plus a consecutive 1 year enhancement, plus a consecutive 3 year term on the arson count. During the pendency of this appeal, however, the court modified the sentence to direct that defendant be sentenced to four years on the arson count, "stayed pending completion of service of sentence on the 1st count at which time said stay shall become permanent." The net result was a sentence of 16 years to life, with an additional stayed sentence of 4 years on the arson charge.
Defendant brought this timely appeal.

DISCUSSION

I.

REMOVAL OF JUROR

A. Proceedings.

Defendant's sole challenge to the guilty verdict is that the trial court erred in discharging a juror during deliberations and substituting an alternate juror in his place.
On the morning of the third day of deliberations, the jury submitted a note to the court that, though subsequently misplaced, was characterized for the record by agreement of court and counsel. The note requested guidance on how to proceed when a juror is "using general feelings and not following instructions ... based on a fundamental belief that the love between a mother and son is strong." It asked whether such an approach constituted a "bias" which should be "set aside." In response, the court instructed the jury as follows: "The determination of the facts in this case is to be made by the jury only from the facts that have been proven in this trial directly or circumstantially or by stipulation. [¶] In making such determinations, the jury must not be influenced by emotions that are not evidence, such as pity for a defendant or prejudice against him, and the jury's verdict must similarly not be influenced by other feelings of mere sympathy, passion, conjecture, prejudice not proven as facts by the evidence in this case. [¶] It is permissible for the jury to consider the relationship between the defendant and Mary Hightower to the extent it was presented in the evidence. Any assumptions about parent and child relationships in general are not in evidence, and such assumptions may not influence the jury's findings of fact or the jury's verdict."
After lunch the jury submitted a second note, signed by Juror 1 as foreperson, expressing concern that one or more unidentified jurors were incapable of following the court's instructions in that, instead of discussing evidence, they were discussing "feelings," "suppositions," and "unreasonable interpretations of the evidence." (Underlining in original.) The note reported that the juror had also expressed concerns that the trial was creating severe job and marital difficulties and depriving the juror of sleep. The note concluded that the juror might be unsuited to the particular case in light of "an internal belief system, [whether] personal or cultural, which is precluding that an individual may *684 be capable of committing the charged crime."[1]
The prosecuting attorney requested a hearing into juror misconduct. Defense counsel responded that that he could not see how the occurrences described in the note rose to the level of misconduct, and that the court would be "treading on very thin ice by intruding into the jury's deliberative process at this point with the scant information we have." The prosecuting attorney replied that "we need to find out the extent of the misconduct if in fact it exists. [¶] So I would ask that we identify this person and find out." Defense counsel rejoined that "any inquiry at this point should be limited to the question of whether the jurors believe that further deliberations will result in a verdict or whether they think a verdict is possible in this case."
Implicitly granting the prosecution request, the court convened a hearing in chambers in which the court, and then both counsel, questioned the foreperson, Juror 1. Juror 1 disclosed that the subject of the note was Juror 8, whom she described as Vietnamese. Juror 1 said that the other jurors felt Juror 8 "isn't able to consider the evidence based on the instructions given to us, meaning [he was] not properly considering the evidence without bias, without sentiment, without pity. [He didn't] seem to be able to evaluate the evidence." Juror 8 did not refuse to follow instructions, and indeed appeared to feel that he was following thembut, said Juror 1, "He doesn't seem to be able to separate feelings, sentiment and bias from simply evaluating the evidence." Juror 8 was vague about why he had doubts, but they seemed to go to the issue of motive. He gave reasons for his doubts, but did not attempt to identify weaknesses in the position of the majority jurors, and did not attempt to "assign facts to his reasons." The other jurors had asked him to give reasons, but "he feels the burden is on us to convince him." The foreperson said that Juror 8 had gone beyond the facts shown by the evidence to "[s]peculat[e] as to who he thinks may have killed Mary." He also "interject[ed] a lot of his own personal feelings, his own personal issues into deliberation which we keep trying to get out of deliberation. And unfortunately we feel it's a lot of his own personal feelings that keep coming into play where he can't separate personal feelings and just deliberate.... [¶] All he says is he has a doubt. He thinks his feelings are valid. I really don't think he is capable of separating those things."
Juror 1 also reported remarks by Juror 8 that as a result of the trial he felt he might have lost his job, and maybe his *685 wife, and was not sleeping at night. Juror 1 felt the lack of sleep might have made it difficult or impossible for him to follow instructions because "he doesn't at times make sense, we don't feel he's reasonable. He lacks clarity."
Questioned by the prosecuting attorney, Juror 1 said that Juror 8 described himself as "not articulate enough" to identify evidence or facts supporting his doubts. As Juror 1 described it, "[W]e have a juror who has a fundamental belief in the love between a mother and son which goes to motive which is fundamental. I don't know that this juror is capable of rendering a decision and looking at the evidence where a son has killed a mother and thinking that it's possible." Juror 8 had expressed this inability "[i]n so many words," said Juror 1. "[H]e specifically said had he known it was the murder of a mother by a son he probably shouldn't have been on the jury .... [¶] [b]ecause he cannot imagine what circumstanceshe cannot imagine a son doing that."
Asked by defense counsel whether she thought there was a reasonable probability that further deliberations could produce a verdict, Juror 1 said that based on her 20 years "in sales," the juror in question was exhibiting "a fundamental bias. It is not possible to move him, to make a decision .... We can't go around it, we can't go over it, we can't move him. I cannot get him to look at facts or evidence. It's a fundamental bias."
After completing the questioning of Juror 1, the court observed "for the record" that Juror 8 "didn't appear to be awake during much of the argument in this case. I may be wrong. He may have just been simply resting his eyes, but he did not appear to be awake." The court then stated that it considered excusal of Juror 8 justified by his statement that if he had known the case involved a son's killing of his mother, he shouldn't have been on the jury. Defense counsel at first appeared to concur, stating, "That's right. He did know that this was an allegation of a son killing his mother." However, he then stated that none of the foreperson's statements pointed to misconduct and that to take the purported quote concerning his suitability to be on the jury "out of context ... would lead us down the wrong path." Defense counsel asserted that it was "incumbent to at least talk to [Juror 8] because we've got allegations."
The court then questioned Juror 8, beginning with, "Probably the most important matter is the report that in the jury room you have made a comment that you couldn't imagine a son killing his mother. Did you make such a comment?" Juror 8 replied, "No. I say ... I say that love, a son cannot kill his mother like that in the normal condition." He also denied saying that he shouldn't have been on the jury had he known the defendant was charged with killing his mother. He denied that he had lost his job or that any concern about his job affected his ability to be a juror and to deliberate. He said his statements about marital problems were casual jokes, not meant seriously, and did not interfere with his ability to deliberate and be a juror. Initially he seemed to confess that he suffered insomnia, but attributed it to working very hard and said that it had nothing to do with the trial. Somewhat later, he denied having insomnia at all, claiming that he had only said otherwise "for the sake of conversation."
Questioned by the prosecuting attorney, Juror 8 appeared to acknowledge stating that he shouldn't be on a jury involving a son accused of killing his mother, adding, "It's very hard for me to believe a loving son can kill his mother with so many stab like that." In response to questions from defense counsel, he said he found it hard to believe a son could kill his mother "like *686 that."[2] However, he said he could imagine a case where a son was charged with killing his mother and he would vote guilty.
Juror 8 could not recall whether he said anything in the jury room about not having realized the case concerned a son's alleged killing of his mother, but offered the explanation that "maybe I say that to defend myself. I get a lot of pressure." The court asked him whether he felt he could "be a fair juror in a case where the charge to the defendant is that he's murdered his mother." He replied, "I don't know what it mean fair. To me I can be fair but other people say I am not fair." He stated that he had paid attention to all the evidence, had it in mind, and had tried to explain his point of view to the other jurors. They professed an inability to understand him because he had a problem with the language, and suggested getting an interpreter so he could speak his native language. He told them he didn't have a language problem, only maybe a problem with communication. They also told him he had a cultural problem. He said, "I get a lot of pressure, a lot of personal attack."
Juror 8 responded ambiguously to questions concerning the standard of proof to which he would hold the prosecution.[3] *687 Noting the seeming inconsistency of his answers, the court asked, "In a case where, as here, the charge is that a son has murdered his mother, would you require more from Mr. Golde than proof beyond a reasonable doubt to bring in a verdict of guilty?" Juror 8 replied, "I say no, because I only have a few evidence but I weigh that evidence very heavily, so that mean it very hard to prove.... Like I understand when we sit in court we listen a lot of evidence, maybe a hundred evidence or a thousand evidence, but every people weigh evidence differently, but I weigh like only a few evidence heavily, so it make me have some doubt." The prosecutor then asked whether Juror 8 would require an eyewitness in every case, or whether he could base his decision on circumstantial evidence. Juror 8 replied, "Like sometime we don't need an eyewitness."
After concluding its questioning of Juror 8, the court questioned, and permitted counsel to question, each of the other jurors. The court commenced each juror's questioning, as it had the questioning of jurors 1 and 8, with an admonition not to disclose the contents of deliberations. The court also concluded each juror's questioning with an admonition not to disclose the questions asked of that juror, or the answers given.
In the course of this questioning, ten jurors reported that Juror 8 made comments to the effect that he could not imagine or could not believe a son would murder his mother. Four of the ten recounted qualified versions of the statement, i.e., that Juror 8 could not imagine a "loving son" committing such an offense, or could not imagine him doing so unless he was "under the influence," or was subjected to "exorcism" or "some X-file-like forces."[4]
Five jurors recalled Juror 8 making statements to the effect that in view of the nature of the case, he should not, or "perhaps" should not, be serving on the jury. Two other jurors recalled comments by Juror 8 to the effect that he "shouldn't be here" or "d[id]n't belong." Two jurors recalled no such statement. Two were not asked. As noted above, Juror 8 himself initially denied making such a statement, but later said he was "unsure" whether he said something like that.
Two jurors reported that Juror 8 said he hadn't realized the case involved charges of a son killing his mother. Another juror inferred from Juror 8's statements that he had not realized the case involved such allegations. Two jurors recalled no such statement.
Six jurors reported hearing Juror 8 complain of insomnia or difficulty sleeping. Seven jurors reported that on one or more occasions, he appeared to be sleeping in the jury box during trial or the readback of testimony. One juror thought Juror 8 was sleeping in the jury deliberation room.
After completing its questioning of the jurors, the court announced its intention to *688 "make a finding that he's excused." The prosecutor expressed support; defense counsel made a "counter motion" to "declare a mistrial because this jury is obviously deadlocked." Finding that Juror 8 had committed misconduct in four respects, the court excused him.[5] It seated the first alternate juror in his place, and instructed the jury to begin deliberations anew. The reconstituted jury returned a verdict of guilty.
Some time later the trial court filed a lengthy "Memorandum re Lost Jury Question and Discharge of Juror." In addition to summarizing the proceedings just described, the memorandum expressed the court's views concerning the general issues raised by such situations, and the correct handling of those issues. In addition it recited certain findings of fact, including that Juror 8 "was not truthful in most of his answers to the questions put to him in the in[-]chambers interview," that the court "believe[d] the testimony of the eleven jurors other than [Juror 8] on the subject of juror misconduct," and that the court "d[id] not believe the testimony of [Juror 8] to the contrary." The court also found that Juror 8 was biased in that he possessed deep feelings preventing him from fairly trying a case of matricide, that he willfully concealed that bias during voir dire, that he was inattentive due to sleepiness, that he should have disclosed his lack of sleep during voir dire, and that his conduct in deliberations amounted to a failure to deliberate.[6]

*689 B. Discussion.

Defendant contends that the trial court's inquiry into Juror 8's conduct effected an excessive and unconstitutional intrusion into the deliberative process in that it "went far beyond an exploration of possible objective, extrinsic evidence of juror misconduct and well into the thought processes by which juror number eight had concluded that he should not vote for a verdict of guilty." He also contends that the discharge of Juror 8 violated his right to a unanimous jury by permitting majority jurors, aided by the court, to remove a juror not convinced beyond a reasonable doubt of defendant's guilt. These contentions raise two broader issues: (1) Under what circumstances does a trial court properly remove a juror, during deliberations, for misconduct or other cause; and (2) what procedures does the court properly employ to determine whether such cause exists?
*690 The Supreme Court addressed these issues in Cleveland, supra, 25 Cal.4th 466, 106 Cal.Rptr.2d 313, 21 P.3d 1225. The court first reaffirmed that a trial court has the discretionary power to discharge a juror for "`good cause shown.'" (Id, at p. 474, 106 Cal.Rptr.2d 313, 21 P.3d 1225, quoting Pen.Code, § 1089; see Code Civ. Proc., §§ 233, 234.) This power is properly exercised, however, only if grounds for removal "`"`appear in the record as a demonstrable reality.'"'" (Cleveland, supra, 25 Cal.4th at p. 474, 106 Cal.Rptr.2d 313, 21 P.3d 1225 quoting People v. Marshall (1996) 13 Cal.4th 799, 843, 55 Cal. Rptr.2d 347, 919 P.2d 1280). The court cited with approval decisions holding that jurors may be discharged for physical or emotional inability to perform their function as jurors, including sleeping during proceedings. (Ibid.) The court also affirmed that jurors may be discharged for refusal to deliberate, while warning that "caution must be exercised in determining" whether this has occurred. (Id, at p. 475, 106 Cal.Rptr.2d 313, 21 P.3d 1225.)
The court then discussed the considerations, which should guide an initial determination whether to investigate a suggestion of grounds to discharge a juror. The court cited approvingly decisions which "recognized the need to protect the sanctity of jury deliberations" and to "`"assure[] the privacy of jury deliberations by foreclosing intrusive inquiry into the sanctity of jurors' thought processes."'" (Cleveland, supra, 25 Cal.4th at p. 475, 106 Cal.Rptr.2d 313, 21 P.3d 1225 quoting In re Hamilton (1999) 20 Cal.4th 273, 294, fn. 17, 84 Cal.Rptr.2d 403, 975 P.2d 600.) However, the court further recognized that "[t]he need to protect the sanctity of jury deliberations ... does not preclude reasonable inquiry by the court into allegations of misconduct during deliberations." (Id. at p. 476, 106 Cal.Rptr.2d 313, 21 P.3d 1225.) The court went on to acknowledge decisions in which trial courts committed reversible error by failing to inquire sufficiently into suggestions of jury misconduct. (Id, at p. 477, 106 Cal.Rptr.2d 313, 21 P.3d 1225.) Implicitly relying on the tension between these competing considerations, and on the infinite variations in fact patterns, the court reaffirmed that "`[t]he decision whether to investigate the possibility of juror bias, incompetence, or misconductlike the ultimate decision to retain or discharge a jurorrests within the sound discretion of the trial court. [Citation.] ... [¶] As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case. [Citation.]'" (Id, at p. 478, 106 Cal.Rptr.2d 313, 21 P.3d 1225, quoting People v. Ray (1996) 13 Cal.4th 313, 343, 52 Cal.Rptr.2d 296, 914 P.2d 846.) On the other hand, if the court is "on notice that there may be grounds to discharge a juror during deliberations," and if reinstructing the jurors on their duties fails to resolve the difficulty, then the trial court "must conduct `whatever inquiry is reasonably necessary to determine' whether such grounds exist." (Id, at p. 480, 106 Cal. Rptr.2d 313, 21 P.3d 1225; see id. at p. 484, 106 Cal.Rptr.2d 313, 21 P.3d 1225.)
The court went on to note that inquiry into possible grounds for discharge "should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, *691 and that no other proper ground for discharge exists. We also observe that permitting the attorneys for the parties to question deliberating jurors is fraught with peril and generally should not be permitted. Of course, the court may allow counsel to suggest areas of inquiry or specific questions to be posed by the court." (Cleveland, supra, 25 Cal.4th 466 at p. 485, 106 Cal.Rptr.2d 313, 21 P.3d 1225.)
The court also provided guidance as to what constitutes such a failure or refusal to deliberate as will warrant a juror's discharge: "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury. The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (Cleveland, supra, 25 Cal.4th 466 at p. 485, 106 Cal.Rptr.2d 313, 21 P.3d 1225.)
Turning to the case before it, the Supreme Court concluded that the juror's discharge there had been an abuse of discretion because the record did not establish as a demonstrable reality that the juror had refused to deliberate. Although a note from other jurors had stated that the juror was unwilling to apply the law, "it became apparent under questioning that the juror simply viewed the evidence differently from the way the rest of the jury viewed it." (Cleveland, supra, 25 Cal.4th 466 at p. 486, 106-Cal.Rptr.2d 313, 21 P.3d 1225.) Indeed, although ten jurors indicated that they felt the targeted juror was not deliberating, "questioning of the jurors revealed that it was the conclusion arrived at by Juror No. 1 that was at issue." (Ibid.) Nor did the Supreme Court accept the trial judge's conclusion that the juror was not "`functionally deliberating'" because he refused to answer specific questions about facts and elements of the charges, alluding instead to "generalities." Chief Justice George wrote, "It is possible that Juror No. 1 employed faulty logic and reached an `incorrect' result, but it cannot properly be said that he refused to deliberate. Juror No. 1 participated in deliberations, attempting to explain, however inarticulately, the basis for his conclusion that the evidence was insufficient to prove an attempted robbery, and he listened, even if less than sympathetically, to the contrary views of his fellow jurors." (Ibid.) Therefore the trial court abused its discretion by discharging the juror. Because that juror apparently favored the defense, the error was prejudicial. (See ibid., citing People v. Hamilton (1963) 60 Cal.2d 105, 128, 32 Cal.Rptr. 4, 383 P.2d 412, overruled on other grounds in People v. Morse (1964) 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33, and disapproved on another point in People v. Daniels (1991) 52 Cal.3d 815, 866, 277 Cal.Rptr. 122, 802 P.2d 906.)
Here defendant's primary challenge is aimed not at the sufficiency of the record to establish cause for the removal of Juror 8, but at the procedures employed *692 to develop the evidence on which the court relied. We see no violation by the trial court of the principles announced and reaffirmed in Cleveland. The grounds for an initial inquiry were adequately established by the two notes from the jury. The first stated that a juror was "not following instructions" but was "using general feelings" which other jurors felt might constitute a "bias" that the juror improperly refused to "set aside." The court did not intervene at this point, merely reminding the jury of its duties to (1) consider "only ... the facts that have been proven in this trial," and (2) "not be influenced by emotions that are not evidence." Thereafter, the jury submitted the second note, reporting that a juror appeared "not capable of following the instructions of the court in regards to lines of evidence," and was "not discussing evidence as presented in this court" but was instead asserting "feelings" and "suppositions not in evidence," such as that defendant was being framed. In addition, the note stated that the subject juror appeared "seriously concerned that his/her job has been lost due to the trial," that "marital problems may be occurring due to the trial," and that he was "l[o]sing significant sleep at night over concerns for voting correctly." The note reported the concern of other jurors that the juror in question "may be acting under duress" in that "an internal belief system, [whether] personal or cultural" made it impossible for the juror to believe "that an individual may be capable of committing the charged crime." (Underlining and emphatic capitalization omitted.)
These notes suggested at least four possible grounds for removal: actual bias, refusal to comply with instructions, occupational conflicts interfering with the juror's performance of his duties, and serious emotional distress brought on by the attempt to perform those duties. The court therefore acted within its discretion in undertaking an investigation of the matter.
Nor does the record support defendant's contention that the trial court exceeded the scope of permissible inquiry so as to unduly intrude on the deliberative process of the jury. Defendant's argument relies primarily on a line of federal decisions that would effectively bar the trial court from conducting any inquiry disclosing the contents of jury deliberations. (United States v. Brown (D.C.Cir. 1987) 823 F.2d 591, 596-597; United States v. Thomas (2d Cir.1997) 116 F.3d 606, 618-624; United States v. Symington (9th Cir., 1999) 195 F.3d 1080.) Those decisions were rejected in Cleveland insofar as they "restricted] a court's authority to inquire into whether a juror is unable or unwilling to deliberate and ... preclude[d] dismissal of such a juror whenever there is `any reasonable possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case.'" (Cleveland, supra, 25 Cal.4th at p. 484, 106 Cal.Rptr.2d 313, 21 P.3d 1225, quoting United States v. Symington, supra, 195 F.3d 1080, 1087.) Rather, the court "adhere[d] to established California law authorizing a trial court, if put on notice that a juror is not participating in deliberations, to conduct `whatever inquiry is reasonably necessary to determine' whether such grounds exist [citation] and to discharge the juror if it appears as a `demonstrable reality' that the juror is unable or unwilling to deliberate." (Cleveland, supra, 25 Cal.4th at p. 484, 106 Cal.Rptr.2d 313, 21 P.3d 1225.)
Here it is not effectively disputed that the initial notes to the trial court raised sufficient grounds to warrant, and indeed to require, further investigation. The court first quite properly limited its investigation to questioning the foreperson, who was apparently the author of at least the second note, and then the suspect juror. Only when this left doubts about the facts *693 of the matter did the court go on to question the remaining jurors. We cannot say that the trial court conducted an unnecessarily intrusive inquiry.
Ultimately the court found cause to remove Juror 8 for (1) concealing a bias which prevented him from fairly determining the truth in a case involving allegations of matricide; (2) falsely stating in voir dire that he could be a fair juror in a case involving such allegations; (3) failing to deliberate by, among other things, alluding to extraterrestrials and exorcism rather than the evidence adduced at trial; and (4) sleeping during the taking of evidence. The evidence supports at least the first and last of these findings, and the inquiry undertaken appeared reasonably calculated to produce this evidence. While the evidence also established that he entertained doubts about the prosecution's case, those doubts did not preclude his discharge in light of the existence of independent, proper grounds for removing him. Accordingly we find no error in the court's removal of Juror 8 and substitution in his place of an alternate juror.

II.[**]
The judgment is affirmed as modified by the trial court's order of December 8, 1998.
I concur: REARDON, Acting P.J.
KAY, J.
I respectfully dissent. This case is like People v. Cleveland (2001) 25 Cal.4th 466, 106 Cal.Rptr.2d 313, 21 P.3d 1225, where the quality of a juror's thought process and deliberations has been confused with misconduct. Cleveland confirms that the substantial evidence required to remove a deliberating juror must establish the juror's inability to perform his or her duties as a "demonstrable reality." (Id. at p. 474, 106 Cal.Rptr.2d 313, 21 P.3d 1225.) Since that standard is not satisfied here as to any of the alleged misconduct, I would reverse the judgment. I would also reverse on the independent ground that, under the standards set forth in Cleveland, the interrogation of the jury impermissibly intruded into the deliberations and deprived appellant of his right to an impartial jury.
In light of Cleveland, the majority rightly abandons any attempt to uphold the removal of Juror 8 on the ground that he was not deliberating. There is no evidence that Juror 8 expressed a fixed conclusion at the beginning of deliberations, or refused to speak to other jurors or consider their opinions. (See People v. Cleveland, supra, 25 Cal.4th at p. 485, 106 Cal.Rptr.2d 313, 21 P.3d 1225 [citing examples of failures to deliberate].) Other jurors complained that Juror 8 did not give what they considered to be good reasons for his point of view, not that he refused to discuss the case.[1] They reported that he interjected his feelings, and matters they considered speculative and irrelevant, into the discussion.[2] They found him hard to *694 understand, in part because he had problems expressing himself well in English.[3] However, "[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge." (Ibid.)
The majority likewise does not attempt to justify Juror 8's dismissal on the ground that he answered questions falsely during jury selection. I agree that Juror 8's responses to the very general questions posed to him during his brief voir dire provided no basis for his removal. The majority concludes that Juror 8 "concealed a bias" that prevented him from fairly determining appellant's guilt, and thus presumably that he was obliged, at some stage, to report that he could not serve as a juror. But this conclusion assumes that Juror 8 harbored a disqualifying bias (see People v. Cleveland, supra, 25 Cal.4th at p. 478, 106 Cal.Rptr.2d 313, 21 P.3d 1225 [sitting juror may be discharged for bias that would have supported challenge for cause]), and I find no substantial evidence for that assumption.
The record shows that Juror 8 simply weighed the evidence differently than the other jurors. According to Juror 5, the other jurors "had everything laid out, we had the facts and the evidence and so on and so forth, and we said [to Juror 8] if you can convince us otherwisethis is how we see it and we pretty much agreed and he had another point of view." Presumably the "facts" the other jurors "laid out" were the pieces of circumstantial evidence pointing to appellant's guilt. However, Juror 8 said it was "very hard for me to believe a loving son can kill his mother with so many stab like that." (Italics added.) It thus appears that, despite the incriminating circumstantial evidence, Juror 8 doubted appellant's guilt because, in his mind, the manner in which the murder was committed did not square with the evidence that appellant and his mother had a loving relationship.
As Juror 8 tried to explain to the judge, he doubted appellant's guilt because he put great weight on a small portion of the evidence. When Juror 8 was asked whether he would require proof beyond a reasonable doubt to convict appellant, he replied, "I say no, because I have only a few evidence but I weigh that evidence very heavily, so that mean it very hard to prove ... [¶] ... like I understand when we sit in court we listen a lot of evidence, maybe a hundred evidence or a thousand evidence, but every people weigh evidence differently, but I weigh like only a few evidence heavily, so it make me have some doubt." The manner of the killing and the loving mother-son relationship were the two aspects of the case Juror 8 weighed "heavily," and caused him to have a reasonable doubt notwithstanding the "hundred" or "thousand" other indicia of guilt. That Juror 8 did not give the circumstantial evidence in this case as much weight as the other jurors did not mean that he harbored a bias or committed misconduct. Juror 8 had a right to his opinion of the People's case. (People v. Cleveland, supra, 25 Cal.4th at p. 483, 106 Cal.Rptr.2d 313, 21 P.3d 1225 ["a court may not dismiss a juror during deliberations because that juror harbors doubts about the sufficiency of the prosecution's evidence"].)
The holdout in Cleveland had a similar unique view of the evidence, which did not *695 credit the "details" the other jurors found persuasive. As the Cleveland juror explained, "`I present the whole case as I see it in its totality. I didn't want to go into the details of the case and mislead each other by arguing about various little things the way each juror sees it. I tend to present my view of the whole picture, and if other jurors, of course, don't like that view, then I just have to go with my own conscience.'" (People v. Cleveland, supra, 25 Cal.4th at p. 473, 106 Cal. Rptr.2d 313, 21 P.3d 1225.) Like the other jurors in appellant's case, those in Cleveland "complained that [the holdout] discussed matters that they considered `irrelevant' and adopted an `unreasonable interpretation' based upon `his own personal opinion,' while `the rest of us have a different interpretation.'" (Id. at p. 486, 106 Cal.Rptr.2d 313, 21 P.3d 1225.) In Cleveland, as here, "it became apparent under questioning that the [holdout] juror simply viewed the evidence differently from the way the rest of the jury viewed it." (Ibid.) The Cleveland holdout's distinct view of the evidence did not mean that he was unwilling to apply the law or was otherwise guilty of misconduct. (Id. at pp. 485-486, 106 Cal.Rptr.2d 313, 21 P.3d 1225.) We should reach the same conclusion on the same facts with respect to Juror 8.
The trial court's finding that Juror 8 was "biased" is insupportable. Juror 8 stated that he could be "fair" in assessing the case, even though "other people say I am not fair," and that he could conceive of a case where he would vote to convict a son of killing his mother. No substantial evidence casts doubt on the truth of those statements. Juror 8 is reported to have said that he could not imagine a son killing his mother, and that if he had known this case involved such a charge he should not have been on the jury, but those remarks, in context, did not demonstrate an inability to "`properly perform his duty to render an impartial and unbiased verdict.'" (People v. Cleveland, supra, 25 Cal.4th at p. 477, 106 Cal.Rptr.2d 313, 21 P.3d 1225.)
When Juror 8 was asked whether he had commented that he could not imagine a son killing his mother, he replied, "No. I say [¶] ... [¶] I say that love, a son cannot kill his mother like that in the normal condition." (Italics added.) Most of the other jurors reported that Juror 8 had indeed said in so many words that he could not imagine or understand a son killing his mother, and I assume that he made such statements. But the jurors also indicated that Juror 8 said he could not believe a "loving" son would kill his mother unless the son was "under the influence." They said that Juror 8 took this point to an "absurd" extreme, referring to demonic possession and "X-file like-forces," and stating that "when he's drunk he never reacts that way."
Juror 8's statements may have been eccentric, but his thought process reflects a weighing of the evidence. Juror 8 gave great weight to evidence that appellant and his mother had a loving relationship, and thus did not believe that appellant was capable of brutally murdering his mother unless he were "under the influence" (or as Juror 8 put it, not "in the normal condition"). That belief cannot be characterized as a "categorical bias" because it would not have prevented Juror 8 from convicting appellant had it been proven to his satisfaction that appellant was "under the influence" when the crime occurred. (Evidence that appellant had a drug problem and had quarreled with his mother about drugs permitted but did not compel that inference.)
Nor could Juror 8 be removed solely for saying that he could not imagine a son killing his mother. Heinous crimes like the one charged here are in a manner of speaking unimaginable. I might have made the same remark in discussing this *696 case, and I do not think it would have disqualified me from serving on the jury.
Juror 8 admitted that he might have made statements to the effect that, had he known the case involved a son killing his mother, he should not have been on the jury. But he said that he had in fact understood the nature of the charges before the trial began, and explained that he only suggested otherwise to defend himself after the other jurors accused him of being biased, adding, "I get a lot of pressure, a lot of personal attack." The trial court purported to determine that Juror 8 did not truthfully answer most of the questions in his interview, but there was no basis to question Juror 8's account of the circumstances that led him to wonder whether he should have been on the jury because his explanation was corroborated by the other jurors.
The other jurors confirmed that Juror 8 began remarking that he should not be on the jury only after a substantial period of deliberation,[4] when he was, as he put it, under "pressure." The thought did not originate with Juror 8. When Juror 3 was asked whether Juror 8 had said that he should not be serving on the case, Juror 3 responded: "Well, the statementsstatement that came closest to saying that or said it in not so many words wasactually I think I had made a statement something likeafter countless hours of going back and forth about his emotions, about he can't believe how a son would kill his mother, finally I said maybe you shouldn't have been a juror since you're bringing your own personal feelings into it. That's when he nodded. [¶] The last time we met on Thursday towards the end I think he finally admittedI'm not sure of the exact wordsbut he said I shouldn't be here, somebody else should be here, I just want to leave, something like that ... [¶] ... [¶] I remember him nodding when people began to suggest, myself included, that he shouldn't be a juror and maybe you're bringing your personal feelings in it. He began to nod slowly." Juror 3 said Juror 8 did not deny knowing the charges in the case until after Juror 3 accused him of being unfit to serve on the jury. According to Juror 2, Juror 8 "feels like an outcast or something. If he had known this he wouldn't have become a juror. In fact he wanted to get off. He said you folks don't want me here, I'll go home, or something like that."
Not everyone can be Henry Fonda in Twelve Angry Men (Orion-Nova Production/United Artists 1957). Someone in Juror 8's position, who feels that he cannot articulate his views as well as the other jurors and is being told by other jurors that he does not belong on the jury might be expected to begin agreeing with them, and might even go so far as to claim that he did not know what he was getting into when he originally said he could be fair and impartial. He should not be disqualified for making such statements because they are reflective of duress, not bias, under the circumstances.
In this respect, the only difference between this case and Cleveland is that the holdout in Cleveland was evidently better able to stand up to the other jurors who thought his views were illegitimate. In Cleveland, as here, the holdout was reportedly *697 "making judgments and speculations based on his personal feelings" and "`disregarding the facts altogether.'" (People v. Cleveland, supra, 25 Cal.4th at p. 472, 106 Cal.Rptr.2d 313, 21 P.3d 1225.) However, the holdout with "`his own agenda'" (id. at p. 473, 106 Cal.Rptr.2d 313, 21 P.3d 1225) in Cleveland was able to "`go with [his] own conscience'" (ibid.) and could state, "`this is my opinion and you have a right to your own opinion'" (id. at p. 472, 106 Cal.Rptr.2d 313, 21 P.3d 1225). Juror 8 was apparently not so confident. When challenged by the other jurors, he did not respond, like the juror in Cleveland, "I've said all I want to say, I won't answer no questions"; instead, he reportedly became "very angry" and "very defensive." But Juror 8's insecurity did not constitute misconduct, even if it caused him to deliberate poorly. (Id. at p. 485,106 Cal.Rptr.2d 313, 21 P.3d 1225.)
Juror 8 attempted to explain his position and, according to most of the jurors who elaborated, gave reasons for his conclusion apart from an inability to believe that a son would ever kill his mother. Those reasons were articulated during Juror 8's interview, and while they were not persuasive to the other jurors, they were based on the evidence in the case. Thus, the record does not establish to a "demonstrable reality" that Juror 8's views were the product of any "categorical bias." The reports of "bias" in this case were as unfounded as those of the failure to deliberate in Cleveland. "[Q]uestioning of the jurors revealed that it was the conclusion arrived at by [the holdout] that was at issue." (People v. Cleveland, supra, 25 Cal.4th at p. 486, 106 Cal.Rptr.2d 313, 21 P.3d 1225, italics added.)
As for the finding that Juror 8 slept during the trial, if that were really of concern to the court, then presumably it would have addressed the problem before the jury spent two days deliberating. The court and some jurors saw Juror 8 with his eyes closed and thought that he might be sleeping.[5] No one, including the juror who sat beside Juror 8 in the box and thought that Juror 8 had fallen asleep during the trial, heard Juror 8 snore or saw him slump in his chair. The court never even asked Juror 8 whether he had fallen asleep. On this evidence it was speculative to conclude that Juror 8 ever slept during the proceedings. That "fact" does not "`"appear in the record as a demonstrable reality"'" (People v. Cleveland, supra, 25 Cal.4th at p. 474, 106 Cal. Rptr.2d 313, 21 P.3d 1225), and did not justify the removal of Juror 8.
Since there was no substantial evidence of misconduct on the part of Juror 8, it was an abuse of discretion to remove him from the jury. The error was prejudicial and requires that there be a new trial. (People v. Cleveland, supra, 25 Cal.4th at p. 486, 106 Cal.Rptr.2d 313, 21 P.3d 1225, citing People v. Hamilton (1963) 60 Cal.2d 105, 128, 32 Cal.Rptr. 4, 383 P.2d 412.)
*698 The judgment should also be reversed because the interrogation of the entire jury during deliberations effectively coerced the verdicts. (See People v. Cleveland, supra, 25 Cal.4th at p. 475, 106 Cal. Rptr.2d 313, 21 P.3d 1225, citing People v. McIntyre (1990) 222 Cal.App.3d 229, 232, fn. 1, 271 Cal.Rptr. 467 [verdict may be coerced if jury inquiries are too extensive], and People v. Talkington (1935) 8 Cal. App.2d 75, 85-86, 47 P.2d 368 [court should not invade secrecy of deliberations or endeavor to induce verdict].) It was appropriate to undertake an investigation in response to the jury's notes, but the inquiries were pressed too far. It should have been apparent after the interviews of Jurors 1 and 8 that the allegations of Juror 8's misconduct or incapacity were unfounded. While there are no bright-line rules dictating when an investigation must cease, I believe it was prejudicial error to continue to relentlessly question every juror in this case about what was wrong with the lone holdout for an acquittal.
Juror 1, the foreperson, reported in the first interview all of the observations and concerns later echoed by the other jurors: that Juror 8 did not "properly" consider the evidence; that Juror 8 had "pretty much" said that he could not imagine a son killing his mother; that after awhile Juror 8 began saying that he "probably" should not have been on the jury; that Juror 8 was "frustrating" the other jurors. However, Juror 1 also acknowledged that Juror 8 thought he was following the court's instructions, and gave reasons for his views. Juror 8 then explained what those reasons were, and showed that they were based on a weighing of the evidence. He very plausibly attributed his most extreme remarks to severe pressure from the other jurors. His answers should have put the allegations of misconduct to rest, but the court proceeded to interview every other juror. Those additional interviews accomplished nothing apart from confirming that Juror 8 was indeed subjected to intense pressure.
Further investigation is not absolutely prohibited once any "reasonable possibility" appears that a juror's alleged bias stems from his or her views of the merits of the case. (See People v. Cleveland, supra, 25 Cal.4th at p. 484, 106 Cal. Rptr.2d 313, 21 P.3d 1225, rejecting inter alia U.S. v. Thomas (2d Cir.1997) 116 F.3d 606, 620-621.) However, interrogation of deliberating jurors is a "`sensitive'" and "`delicate'" matter (People v. Cleveland, supra, at p. 481, 106 Cal.Rptr.2d 313, 21 P.3d 1225) because "[t]he very act of questioning ... could affect th[e] deliberations" (id. at p. 476, 106 Cal.Rptr.2d 313, 21 P.3d 1225). Cleveland therefore "`foreclosed] intrusive inquiry into the sanctity of jurors' thought processes'" (id. at p. 475, 106 Cal.Rptr.2d 313, 21 P.3d 1225), and directs that any inquiry into possible grounds for discharge of a deliberating juror be "as limited in scope as possible" (id. at p. 485, 106 Cal.Rptr.2d 313, 21 P.3d 1225). The investigation should focus on jurors' conduct, not on the content of their deliberations. (Ibid.) Counsel should not be permitted to question the jurors. (Ibid.) Inquiries may continue until the court is satisfied that there are no grounds for removal, but should cease in a case of alleged bias once it appears that the juror is adhering to the court's instructions. (Ibid.)
The inquiry in this case contravened these guidelines in Cleveland. From the time Juror 1 reported that Juror 8's intransigence made further deliberations pointless, the court seems to have been determined to remove Juror 8 by any means necessary. After interviewing Juror 1 and before even speaking with Juror 8, the court said that it had heard "enough to excuse [Juror 8]," and volunteered that Juror 8 might have slept during argument.
*699 After Juror 8 provided satisfactory if ineloquent answers to the court's questions and those posed by counsel, the court, with counsel's continuing assistance contrary to Cleveland, proceeded to probe Juror 8's thought process with all of the other jurors. As the interviews became more perfunctory, they focused increasingly on whether Juror 8 had ever fallen asleep. After those interviews were done, the court invited the parties to make their arguments for the record, but announced before they did so that it had already made up its mind to excuse Juror 8. The court cited multiple reasons for its decision, apparently hoping that at least one of them would stick. (If Juror 8 was not biased and had not failed to deliberate, then he was asleep.) In its written ruling, the court seized upon the "X-files" comment of one juror, in the tenth interview, to the same end. (If Juror 8 was not biased or asleep, then he was deranged). The long memorandum sought to further bulletproof the ruling with a finding that Juror 8 lied during most of his interview, even though his answers were very consistent with those of the other jurors. (If Juror 8 was not biased, asleep or crazy, then he was a liar). In my view, this result-oriented quest to avoid a mistrial went well beyond the "delicate," "reasonably necessary" investigation contemplated by Cleveland. (People v. Cleveland, supra, 25 Cal.4th at pp. 482, 484, 106 Cal. Rptr.2d 313, 21 P.3d 1225.)
Appellant's original jury deliberated over two days to a deadlock. At that point, 11 of the 12 jurors were summoned into chambers, one by one, and asked by the court and the prosecutor what was wrong with the thinking of the one juror who was not persuaded by the People's case. After that questioning, it is not surprising that the reconstituted jury needed little more than two hours to render its guilty verdicts. I would hold that the court's overly intrusive investigation into Juror 8's alleged misconduct deprived appellant of his Sixth Amendment right to an impartial jury.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for
[**] The Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977.)
[1] The note stated: "We are concerned a juror(s) are not capable of following the instructions of the court, in regards to lines of evidence. [¶] This juror/jurors are NOT discussing evidence as presented in this court, but are discussing `feelings.' [¶] This juror/jurors are discussing suppositions not in evidence (others are framing the defendant). [¶] This juror/jurors are discussing unreasonable interpretations of the evidence. We have NOT been accorded lines of evidence which support the alternative interpretation. [¶] Further: [¶] These individuals are seriously concerned that his/her job has been lost due to the trial (multiple statements). [¶] These individuals have stated that marital problems may be occurring due to the trial. [¶] These individuals have stated that they have been l[o]sing significant sleep at night over concerns for voting correctly. [¶] We are concerned that this/these individuals may be acting under duress, and [¶] We are concerned that, as Mr. Berger said, `There is a trial for every juror and a juror for every trial.' We are sincerely concerned that this trial is NOT for this, or these, jurors. [¶] We are likely facing an internal belief system, [whether] personal or cultural, which is precluding that an individual may be capable of committing the charged crime. [¶] As a result ... we are at an impasse." (Underlining and ellipsis in original.)
[2] As occurred more than once, Juror 8 actually gave contradictory answers to some of the crucial questions, and his responses were rendered all the more ambiguous by the compound or convoluted wording of some of the questions. The relevant exchange here is transcribed as follows:

"Mr. Berger: Q First, I want to make sure the answer to one of the judge's first questions wasis this what you said? Did you say you find it hard to believe that a loving son can kill his mother like that under normal conditions?
"A Yes.
"Q And when you say `like that,' you are referring to the number of stabs?
"A Yes.
"Q And you heard very, very early in the trial when the judge told everybody that Mr. Hightower is accused of killing his mother. He said that early on.
"A Yes.
"Q You heard that. And at that point you didn't think that you could not be a fair juror in this case, did you?
"A Yes.
"Q You thought that it would be okay for you to serve, you would not be biased?
"A Yes.
"Q And also I want to make sure I understand. You say you think that you're being fair back there although some of the other jurors think that perhaps you're not.
"A Yes.
"Q If you made a statement like the one the judge asked you about or Mr. Golde asked you about, you may or may not have said something to that effect, but it was basically in the course of defending yourself against a lot of pressure from the other jurors?
"A Yes."
[3] "Q [By the Court] If you were sitting on a case where a stranger killed another stranger would you have any trouble bringing in a verdict of guilty if the District Attorney proved the case beyond a reasonable doubt?

"A Yes.
"Q Would you have any trouble bringing in a verdict of guilty if the District Attorney proved the case beyond a reasonable doubt?
"A Yes.
"Q You would have trouble?
"A Yeah.
"Q Do you have any feeling ... I'm not certain whether you understand it ..., you would have trouble bringing in a verdict of guilty even if the District Attorney proved that a stranger killed another stranger?
"A Yes.
"Q You would have trouble doing that?
"A No.
"Q You wouldn't. Okay. In a case such as we have before us today, where the charge is that the defendant murdered his mother, would you require more from the District Attorney than proof beyond a reasonable doubt to bring in a verdict of guilty?
"A Yes.
"Q [By Defense Counsel] ... [I]f you're on a jury in any case where a son is accused of killing his mother, not necessarily this case, it could be not stabbing, it could be shooting, it could be poison, it could be one stab wound, it could be anything, if you're on that jury, any case where the son is accused of killing his mother, would the District Attorney ever be able to prove his case to you or would it be impossible?
"A Yes.
"Q So you can imagine a case where the son is charged with killing his mother where the son would be guilty and you would vote guilty?
"A Yes.
"Q Would Mr. Golde, would the District Attorney have to prove his case more than beyond a reasonable doubt or would he just have to do whatever he has to do in this case, prove it beyond a reasonable doubt?
"A Yes."
[4] Although no formal request for judicial notice has been made, we assume the last-quoted comment refers to the current television series "The X-Files," which chronicles fictional investigations of extraterrestrial visitations and paranormal phenomena.
[5] The court stated its ruling as follows: "I find from the inquiry conducted in chambers, and after having taken into account the statements of counsel by way of argument, that Juror No. 8 is guilty of misconduct in several respects.

"It's a fair inference from the fact that the nature of the charge, Count 1, was mentioned by the court, by both counsel on numerous occasions during the course of the voir dire examination, that Juror No. 8 was fully aware of the fact that this case included a charge of murder and that the defendant is accused of having murdered his mother and at that time Juror No. 8 had a belief that prevented him from being a fair juror in such a case.
"I also find that Juror No. 8 failed to deliberate. Now it's true that he participated in some respects, but failure to deliberate can occur in a number of different ways other than just simply withdrawing from the deliberations. Engaging in supposed deliberations that deal with exorcism and aliens is, in my opinion, a refusal to deliberate to that extent. I find that to be true, too.
"The evidence is overwhelming that Juror No. 8 didn't hear all of the evidence. None of the jurors questioned stated thatthere was no question but that he was asleep, all expressed an opinion that he was asleep, and the last juror, if I remember correctly, said that whenon the last occasion that Juror No. 8 was asleep during readback of testimony when the jurors returned to the jury deliberation room Juror No. 8 could not even recall what the readback was, and the inference is compelling that he was asleep and the fact that he missed part of the testimony, he missed other parts of the testimony. If a juror misses parts of the testimony because they are asleep that is inattentiveness and that's misconduct.
"I think too that it satisfactorily appears that Juror No. 8 responded falsely to a question asked on the voir dire examination as to his ability to be fair in a charge of murder when the accused is the son of the victim. I think Juror No. 8's predisposition that no son can ever murder his mother and of course that's simply not true.
"The addition of loving to the argument I don't think makes much difference because it's certainly true that a loving son or loving mother can-a loving son may murder the mother and a loving mother may murder a child. The cases are many in which such event has occurred.
"Having made these findings I conclude that Juror No. 8 is guilty of juror misconduct, cannot be a fair juror and should be and is excused."
[6] "I have found from the evidence that [Juror 8] has deep[-]rooted feelings that prevented him from fairly hearing a case of matricide. [Juror 8] disclosed his bias in the jury room by statements heard by all but one juror. From the admission, in the jury room, that [Juror 8] would not have become a juror if he had known the case charged murder of defendant's mother, I conclude that [Juror 8] gave false answers to the questions asked on jury voir dire. On many occasions before and during the voir dire examination the court and each counsel reminded the jury that the charge was murder of defendant's own mother. The jury, including [Juror 8], was asked whether there was ... anything whatever about the case that would cause the juror to suspect his ability to be a fair juror.

"The District Attorney inquired of the jurors preceding [Juror 8] whether the jurors could bring in a verdict of guilty if there was not an eyewitness but only circumstantial evidence alone. [Juror 8] did not make known his reservations about conviction in a case proved by circumstantial evidence. While there may be some question about [Juror 8's] command of the English language there is nothing to suggest that [Juror 8] suffered from a hearing deficit. It is a virtual impossibility that [Juror 8] did not hear at least one of the many references to the nature of the case as being one charging matricide. His failure to disclose his suspicion about ability to be a fair juror was intentional. I am persuaded that before and at the time of the voir dire examination, [Juror 8] held a deep[-]seated belief or feeling that a son could never murder his mother; that he knew that this was his bias at the time he answered the question on the voir dire; that he understood the questions on the voir dire examination on the subject of a son murdering his mother and that he wilfully failed to disclose his bias in this respect. I find that by reason of this undisclosed bias [Juror 8] had pre-judged the issue, [citations]; refused to follow the instructions on the law; refused to deliberate in the sense that what purported to be deliberation was avoidance of deliberation by interjecting absurdities e.g. exorcism and x-files forces; that in falling asleep during the trial he was inattentive. [Citation.] I believe that nothing short of an eyewitness to the killing would get [Juror 8] past his bias, and given his comments concerning influencing forces such as exorcism and x-file forces it is possible that even a credible eye witness would not have been sufficient to get [Juror 8] past his bias.
".... [Juror 8] should have disclosed his sleep deprivation problem as a physical condition that might affect his ability to fairly hear the case, and his ability if he found that he had missed some part of the proceedings to request readback of testimony.
"The evidence offered by the eleven jurors other than [Juror 8] amply demonstrated that [Juror 8] could not follow the instructions and apply the law in a case in which the defendant was charged with murder of his mother; that [Juror 8] knew of this bias at the time he answered questions on the voir dire examination and withheld disclosure thereof; that in falling asleep [Juror 8] demonstrated either his prejudgment of the issues, or his inability to give his attention to the evidence, or both. That his assignment of reasons for his position such things [as] x-files forces or exorcism as the cause of death, or that someone was trying to frame defendant when the record is barren of any evidence to support such interpretation had the same effect as an outright refusal to deliberate the case and the evidence received in the trial and was therefore a refusal to deliberate.
"[Juror 8's] inability to serve as a juror ... was proven, in my opinion, to be a clearly demonstrated reality. Good cause for discharge was proven and he was therefore excused for cause."
[**] See footnote *, ante.
[1] Juror 8 stated that he had tried to explain his views, and all of the jurors who were asked said that he had made that attempt. However, to quote Juror I's representative comments, "He doesn't at times make sense, we don't feel he's reasonable. He lacks clarity."
[2] Juror 5 said that Juror 8 attempted to give reasons for his opinions, but "[h]e's not giving us really a reason. He's giving us more feelings." Juror 1 said that Juror 8 "interjects personal sentiment, personal problems, personal issues, personal feelings" into the deliberations. Juror 6 said that Juror 8 tried to point out weaknesses in the prosecution's case, "but he didn't use what I wouldwhat I would think as based on the evidence. He wasn't usinghe was just using kind of conjecture and assuming facts and justhe wasn'tit seemed like we'd ask him to use the evidence and he wouldn't, he would just go back to manipulating words around in the instructions and other things and then he'd go off on a tangent and we'd just leave it at that."
[3] According to Juror 5, Juror 8 admitted that "he couldn't articulate as well as some of the other jurors," but was adamant in telling them "I understand exactly what you're saying."
[4] The jury's deliberations: began at midday on a Wednesday; continued for a full day on Thursday; resumed, after a recess, on the morning of the next Tuesday; and continued into Tuesday afternoon before the jury was interviewed. Juror 8 was reported to have made the remarks in question: on Thursday (Juror 1); on "Thursday towards the end" (Juror 3); "towards the middle of ... the first day," after two or three hours, when the other jurors "had everything laid out" and had "pretty much agreed" on the verdicts (Juror 5); on the "first day" or the "[e]nd of Thursday," when "we had come to an impasse" (Juror 6).
[5] The court ventured that Juror 8 "didn't appear to be awake during much of the argument," but admitted, "he may have just been simply resting his eyes." Some jurors, at the court's prompting, recalled that Juror 8 "appeared" at times to be sleeping, or "seemed" to be "dozing," or occasionally "nod[ding] off." Juror 10 said, "Well, I seen him close his eyes especially that one time when we had rereading of the testimony, sometime last week he did close his eyes. Whether he was sleeping or not, who knows? But I have to add that when we got back into the jury room we were talking specifically what was said, the testimony that was read back to us, and he did not recall certain things, certain facts that was stated during the testimony-rereading of the testimony. So that led me to conclude that he was sleeping." Juror 6 said that Juror 8 "slept in the jury box at least once. At least I saw his eyes closed. I don't know if he was in full sleep."